Steven STATHAROS, Theodore Statharos, Dorothy Statharos, Plaintiffs–Appellants,

v.

NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, Defendant–Appellee.

Docket No. 99–7522

United States Court of Appeals, Second Circuit.

Argued: Aug. 23, 1999

Decided: Dec. 10, 1999

John C. Brennan, New York, NY, for Plaintiffs–Appellants.

Helen P. Brown, Office of the Corporation Counsel of the City of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel, Kristin M. Helmers, and Deborah Rand, on the brief), for Defendant–Appellee.

Before: KEARSE, CALABRESI, and STRAUB, Circuit Judges.

CALABRESI, Circuit Judge:

Steven, Theodore, and Dorothy Statharos appeal from an order of the United States District Court for the Southern District of New York (John S. Martin, Jr., *J.*) denying their application for a preliminary injunction barring enforcement of financial disclosure requirements set forth in a regulation promulgated by the New York City Taxi and Limousine Commission (the "Commission") for shareholders, officers, and directors of corporations owning taxi medallions.

We affirm.

## BACKGROUND

The Statharoses are shareholders in several small, closely-held corporations, each of which owns two taxi medallions. Dorothy Statharos holds 100% of the stock in Chablis Cab Corp. and Roxy Cab Corp. and 50% of the stock in Lettuce Cab Corp. and Hero Cab Corp. She also owns 50% of the stock of TDS Cab Corp. Her sons, Steven and Theodore, together own the remaining 50% of TDS.

The regulation at issue, 35 Rules of the City of New York ("RCNY") § 1–02(*l*) (the "Financial Disclosure Rule" or the "Rule"), was adopted by the Commission on May 28, 1998, as part of a package of rules intended to reform the taxi industry. The regulation provides:

> Each individual medallion owner, member of a partnership owning one or more medallion taxicabs, or shareholder, director or officer of any corporation owning one or more medallion taxicabs shall furnish to the Commission a financial disclosure statement, executed under oath, together with all attachments and documentation required by the Commission. This disclosure statement will be completed on a form provided by the Commission, and shall include but not be limited to the entire disclosure of assets, liabilities, income and net worth of the owner, partner, shareholder, officer or director.

*Id.* In a Statement of Basis and Purpose accompanying the regulations, the Commission noted that the Financial Disclosure Rule "will enable the Commission to protect the public by assuring that medallion owners have sufficient income and assets to operate their businesses, and sufficient assets available to protect the public in the event of serious personal injury and/or other loss where the medallion owner is held liable." The Financial Disclosure Rule complements another new requirement that compels officers and shareholders of medallion-owning corporations to disclose all other licensed taxis in which they have a financial interest. *See* 35 RCNY § 1–02(g).

The new regulations were immediately challenged in New York state court by medallion owners. In *New York City Committee for Taxi Safety v. New York City Taxi and Limousine Commission*, 177 Misc.2d 855, 677 N.Y.S.2d 449 (1998), the New York Supreme Court upheld almost all of them, including § 1–02(g), but struck down the Financial Disclosure Rule as not being rationally related to a valid government objective. *See id.* at 455. The court acknowledged that the Commission's stated goal was legitimate, but found that disclosure of financial information, in the absence of minimum capitalization requirements for medallion-owning corporations, did nothing to further that purpose. *See id.*

The Appellate Division reversed the trial court's holding on the Financial Disclosure Rule and reinstated the regulation. *See New York City Comm. for Taxi Safety v. New York City Taxi & Limousine Comm'n*, 256 A.D.2d 136, 681 N.Y.S.2d 509 (1st Dep't 1998). It characterized the objective of the regulation as "assuring sufficient information to identify taxicab owners who have abused the corporate form by fragmenting their ownership into many undercapitalized corporations in order to shield assets from persons injured as a result of a taxicab's negligence," and concluded that "[t]he choice of the appropriate

means for achieving this legitimate objective is well within the authority delegated to [the Commission]." *Id.* at 510.

After the Financial Disclosure Rule was upheld by the Appellate Division, the Commission prepared a Financial Disclosure Report Form (the "Form") to implement the regulation. All applicants for new or renewal medallion owner's licenses (including all shareholders, officers, or directors of corporations owning medallions, as well as individual owners) are now required to file the Form. The Form requires disclosure—rounded to the nearest $1,000—of (1) all personal and corporate bank accounts, (2) gifts in excess of $500, (3) interests in trusts or estates, (4) investments in any businesses, (5) ownership of any securities, (6) ownership of any real estate, (7) all income received and the source of the income, (8) any transfers of money or property during the reporting year, (9) liability and debt information (including personal and consumer debt, as well as corporate debt), (10) any interest of a spouse or minor children in a Commission-regulated business, and (11) any outstanding civil judgments or tax liens against the applicant or the applicant's spouse or minor children.

The Form contains a "Privacy Notification" that provides:

> The information obtained on this Form will be used by the Taxi and Limousine Commission to determine whether or not the filer complies with the rules of the Commission with respect to taxicab ownership, and whether or not the individual meets the requirements of ownership and is of good moral character, as required by the Commission rules.
>
> No representation is made herein as to whether or not the information contained on this Form is disclosable to a member of the public pursuant to the Freedom of Information Law (FOIL). If you believe that any information contained herein should be withheld from public inspection on the ground that dis-

closure of such information would constitute an unwarranted invasion of privacy, you may assert your basis for this claim below. The Commission will consider this claim in the event disclosure pursuant to FOIL is requested.

A blank space for the applicant's use follows.

On January 21, 1999, plaintiffs brought this action in the district court, seeking to enjoin the Financial Disclosure Rule and to have it declared unconstitutional, on the grounds that it violated their right to privacy (in part because the information it sought was too broad); that it contained no provision shielding the disclosed information from public scrutiny; and that the Commission lacked authority to promulgate it. Subsequently, plaintiffs moved for a preliminary injunction.

Shortly thereafter, in an unpublished memorandum opinion, the district court denied plaintiffs' application for a preliminary injunction, finding that plaintiffs had not demonstrated a likelihood of success on the merits of any of their claims. In early June, the district court denied plaintiffs' motion for a stay pending appeal. And on June 29, this Court also denied plaintiffs' request for a stay, on the condition that during the pendency of the appeal, the Commission would not disclose the telephone numbers or home addresses of the plaintiffs (as stated on their Financial Disclosure Forms) to any third party. The plaintiffs then filed their Financial Disclosure Forms with the Commission, but requested that no information be released to the public without their written consent.

## DISCUSSION

On appeal, plaintiffs argue that the district court erred in denying their request for a preliminary injunction because (1) the Commission lacked authority to promulgate the Financial Disclosure Rule; and (2) the Rule violates their constitutional right to privacy (a) by mandating disclo-

sure of their personal financial information to the Commission and (b) by failing to provide adequate standards governing the release of personal financial information to the public, once such information has been filed with the Commission.

### A. Standard for Issuance and Review of Preliminary Injunction

■ We review a district court's denial of a preliminary injunction for abuse of discretion. *See Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999). A district court abuses its discretion when it applies an incorrect legal standard or relies on findings of fact that are clearly in error. *See King v. Innovation Books,* 976 F.2d 824, 828 (2d Cir.1992).

■ A preliminary injunction may be granted only when the party seeking the injunction establishes that "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama,* 175 F.3d at 270. When, however, the injunction "seeks to prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest," only the likelihood of success standard applies. *Molloy v. Metropolitan Transp. Auth.,* 94 F.3d 808, 811 (2d Cir.1996).

### B. Scope of Commission's Authority

The Taxi and Limousine Commission is established pursuant to the New York City Charter, which defines its purpose as "the continuance, further development and improvement of taxi and limousine service in the city of New York." N.Y. City Charter § 2300. The Commission is specifically authorized to promulgate regulations affecting many aspects of taxi service, including "[r]equirements for the maintenance of financial responsibility, insurance and minimum coverage." *Id.* § 2303(b)(7); *see also id.* § 2303(b)(11) (granting the Commission the power to promulgate "rules and regulations reasonably designed to carry out" the Commission's mandate). The Financial Disclosure Rule, therefore, is government action taken pursuant to statutory authority.

■ Plaintiffs' argument that the Commission acted *ultra vires* in promulgating the Financial Disclosure Rule, in that it impermissibly arrogated powers properly belonging to the legislature, is unavailing. The extent of the Commission's authority is a question of state law, and the Appellate Division has held that the Commission has the power to issue the Financial Disclosure Rule. *See New York City Comm. for Taxi Safety,* 681 N.Y.S.2d at 510 (noting that the City Charter delegates the Commission a "broad grant of authority ... to promulgate and implement a pervasive regulatory program for the taxicab industry, including ... requirements for the maintenance of financial security" (citation omitted)). Plaintiffs in the *Taxi Safety* case did not appeal the Appellate Division's decision to the New York Court of Appeals. As a result, the Court of Appeals has not ruled on this precise issue.

■ While we are not strictly bound by the decision of the Appellate Division, it is nevertheless a well-established principle that the ruling of "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940). We are not so convinced. The language of the City Charter gives the Commission broad authority to issue rules that further its mandate to ensure financial responsibility on the part of the taxi industry. As the Appellate Division found, the Financial Disclosure Rule is well within that au-

thority. We have no reason to think that New York's highest court would hold otherwise.

Plaintiffs cite two Court of Appeals decisions in support of their position. Each, however, is distinguishable from the instant case. In *Boreali v. Axelrod,* 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987), the high court invalidated antismoking regulations promulgated by the Public Health Council ("PHC") on the ground that the detailed regulatory scheme exceeded the PHC's statutory authority over matters affecting the public health. *See id.* at 11–14, 523 N.Y.S.2d 464, 517 N.E.2d 1350. In doing so, the court rested its holding on several "coalescing circumstances" not present in this case, including (1) that the PHC's proposed regulatory scheme contained numerous provisions for exemptions and waivers made not for public health reasons, but solely on economic and social grounds, and (2) that in enacting the regulations, the PHC "wrote on a clean slate," rather than merely filling in the interstices of a legislatively expressed policy. *Id.* at 11–12, 523 N.Y.S.2d 464, 517 N.E.2d 1350. In contrast to the "blank slate" of *Boreali,* the enabling legislation before us specifically grants the Commission the power to issue regulations to ensure the financial responsibility of medallion owners. The regulations in the instant case aim to do just that, and, unlike the regulations invalidated in *Boreali,* they do not contain exemptions based on economic or social grounds. The Commission has not arrogated the legislature's power to act in furtherance of broad social or economic policy goals outside the Commission's mandate, and therefore has not improperly exercised its power to engage in interstitial rulemaking within the meaning of *Boreali.*

Plaintiffs also cite *Rapp v. Carey,* 44 N.Y.2d 157, 404 N.Y.S.2d 565, 375 N.E.2d 745 (1978), in which the Court of Appeals struck down Governor Carey's executive order imposing financial disclosure requirements and political activity restrictions on state employees. *Rapp* is inapposite. It did not hold, as plaintiffs contend, that financial disclosure requirements can be mandated only by the legislature. To the contrary, the court expressly noted that "[t]he Governor is ... free to regulate the business activities of employees serving at his pleasure." *Id.* at 165, 404 N.Y.S.2d 565, 375 N.E.2d 745. It noted, however, that not all state employees were appointable or removable by him, and that the proposed requirements would affect employees not under his control. *See id.* As a result, it held that the Governor did not have power to impose the broad associational restrictions and the disclosure requirements in the challenged order. *See id.* Here, in contrast to *Rapp,* there can be no doubt that medallion owners are properly subject to the regulatory authority of the Commission.

. We conclude that the Commission acted within its statutorily delegated powers in promulgating the Financial Disclosure Rule. Consequently, plaintiffs must show a likelihood of success on the merits of their privacy claims in order to win a preliminary injunction. (Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary. *See, e.g., Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996).) We therefore turn to the two aspects of plaintiffs' constitutional privacy claim: (1) the initial disclosure to the Commission; and (2) the potential disclosure to members of the general public through Freedom of Information Law ("FOIL") requests.

### C. The Privacy Claim

1. *Disclosure of Personal Financial Information to the Commission.*—Although the right to privacy is one of the less easily delineated constitutional guarantees, the Supreme Court has held that it encompasses "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). And, following *Whalen,* this Court has recognized the ex-

istence of a constitutionally protected interest in the confidentiality of personal financial information. *See, e.g., Barry v. City of New York,* 712 F.2d 1554, 1558–59 (2d Cir.1983); *cf. California Bankers Ass'n v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (Powell, J., concurring) ("Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy.").

■ This confidentiality interest is not absolute, however, and can be overcome by a sufficiently weighty government purpose. *See Barry,* 712 F.2d at 1560. In deciding when a financial disclosure regulation impinges to an unconstitutional degree on the right of confidentiality, courts must balance—in Justice Brandeis's words—"the right to be let alone" against—also in Justice Brandeis's words—the value of disclosure "as a remedy for social and industrial diseases." As he famously continued, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) ("the right to be let alone"); Louis Brandeis, *Other People's Money and How the Bankers Use It* 62 (1914) ("remedy for social and industrial diseases" and "Sunlight is said to be the best of disinfectants").

Balancing these countervailing principles, this circuit has upheld financial disclosure requirements against privacy challenges in many cases involving public employees. *See Bertoldi v. Wachtler,* 952 F.2d 656 (2d Cir.1991) (per curiam) (upholding disclosure requirements for court clerks); *Igneri v. Moore,* 898 F.2d 870 (2d Cir.1990) (political party chairmen); *Eisenbud v. Suffolk County,* 841 F.2d 42 (2d Cir.1988) (county attorneys); *Kaplan v. Board of Educ.,* 759 F.2d 256 (2d Cir. 1985) (volunteer members of local school boards); *Barry,* 712 F.2d 1554 (all city

employees with salaries of over $30,000). We have also upheld such requirements when applied to private parties seeking to enter the heavily regulated business of garbage carting. *See Sanitation & Recycling Indus. v. City of New York,* 107 F.3d 985 (2d Cir.1997).

■ *Barry* and its progeny applied intermediate scrutiny to the challenged financial disclosure requirements. *See, e.g., Eisenbud,* 841 F.2d at 46; *Barry,* 712 F.2d at 1559–60. While acknowledging that *Barry* established intermediate scrutiny as the appropriate standard for evaluating such requirements imposed on public employees, plaintiffs argue that regulations affecting "private citizens" should be subjected to closer scrutiny. Under more stringent review, they contend, the invasion of privacy they are made to accept violates the Constitution.

Second Circuit precedent, however, does not support such a public/private distinction. Thus, in *McVane v. FDIC (In re McVane),* 44 F.3d 1127 (2d Cir.1995), we explicitly chose to apply the intermediate scrutiny of *Barry* to financial disclosure requests made of "private citizens," albeit in the somewhat different context of a challenge to a subpoena duces tecum. *See id.* at 1138. Moreover, the district court in *Sanitation & Recycling* also applied intermediate scrutiny, *see Sanitation & Recycling Indus., Inc. v. City of New York,* 928 F.Supp. 407, 423 (S.D.N.Y.1996) (Pollack, J.), and in our affirmance of the district court in that case, we gave no indication that we thought a different standard was appropriate, *see Sanitation & Recycling,* 107 F.3d at 1000.

Finally, plaintiffs cite *Kaplan* for the principle that "private" parties have a greater expectation of privacy than do "public" employees. But that case said no such thing. Rather, it found that elected community school board members, like the government employees in *Barry,* could constitutionally be subjected to disclosure requirements. *See Kaplan,* 759 F.2d at

261. This is so because school board members' "status as elected officials ... militates in favor of requiring board members to comply with even more stringent filing provisions than were applied to the employees in *Barry* .... In matters of financial disclosure [elected officials] should expect even less privacy than their private counterparts." *Id.* To the extent that *Kaplan* drew a public/private distinction, then, it placed the employees in *Barry* in the *private* category. Thus, *Kaplan* demonstrates the malleability of the terms "public" and "private," and the necessity for careful consideration of the precise circumstances involved in any privacy claim. It certainly does not support the kind of bright-line distinction sought by plaintiffs.

■ We conclude that intermediate scrutiny is appropriate. We should not be understood to say that one could never make a legal distinction between government employees and participants in a heavily regulated, but not government-operated, industry. Nevertheless, we think the distinction is not significant enough to warrant a shift in the standard of review for privacy claims such as those before us. Because taxis are an important part of the public life of the City and have a City-granted monopoly on providing a crucial service, the taxi industry is pervasively regulated by the Commission. For these same reasons, the Commission has been given broad authority to promulgate rules dealing with every aspect of the industry. Under the circumstances, medallion owners' nominal private status does not sufficiently strengthen their confidentiality interest in personal financial information so as to make the intermediate scrutiny applied in *Barry* inadequate. We conclude that the distinction between "private" parties and "public" employees in this case, insofar as it is relevant at all, is appropriately taken into account in deciding the relative weight of the confidentiality interest and of the countervailing governmental interest in disclosure, rather than in determining the standard of review itself. In-

termediate scrutiny is sufficiently flexible to accommodate both the "public" and the "private" variations on the theme.

\*       \*       \*

Under intermediate scrutiny, if the Financial Disclosure Rule is "designed to further a substantial governmental interest and does not land very wide of any reasonable mark in making its classifications," it must be upheld. *Eisenbud,* 841 F.2d at 46.

■ Without question, the Rule is "designed to further a substantial governmental interest"—the interest in making sure that medallion owners (1) are adequately capitalized to operate their business safely and to satisfy tort judgments, and (2) are not abusing the corporate form to render themselves judgment-proof. Indeed, plaintiffs concede that these goals constitute a substantial governmental interest. The issue that we must decide, then, is whether the Rule bears a reasonable relationship to that interest. Plaintiffs advance three main arguments in support of their claim that the Rule lands too far off the mark and thus cannot meet the second prong of the *Barry–Eisenbud* test.

First, plaintiffs contend that because there are no minimum capitalization requirements for medallion owners, and because corporate directors and shareholders ordinarily would not face individual liability for judgments against the corporation, the reporting requirements serve little purpose. This argument fails, however, because, as the district court noted, an important function of the requirements is to enable courts to pierce the corporate veil (where the corporate form is being used to conduct one's individual business) and thereby to hold the medallion owners responsible for tort judgments. In *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131 (2d Cir. 1991), we pointed out that, under New York law, where the corporation is essentially an alter ego of a family or individual, the veil may be pierced. *See id.* at 138.

*Passalacqua* lists various factors to be taken into account in determining whether the corporation at issue is a "dominated corporation" or alter ego. Among these are "inadequate capitalization" and "whether funds are put in and taken out of the corporation for personal rather than corporate purposes." *Id.* at 139. The *Passalacqua* court, moreover, went further and held that the district court had erred in instructing the jury that undercapitalization alone was not enough to pierce the veil.[1] *See id.* at 142. In view of that holding, we cannot doubt that the Financial Disclosure Rule bears an adequately close relationship to the substantial government interest it aims to promote.[2]

Second, plaintiffs argue that the Rule sweeps too broadly in the information it requests, and therefore lacks an adequately close fit with the goal it is intended to further. In support of this argument, plaintiffs invoke our holding in *McVane.* In that case, we upheld the district court's order enforcing a subpoena duces tecum issued by the FDIC to former directors of a failed bank. *See McVane*, 44 F.3d at 1136. But, applying intermediate scrutiny, we struck down the subpoena as it applied to the directors' families, finding that the privacy rights of disinterested family members outweighed the government's alleged need for their personal financial in-

formation. *See id.* at 1138. The Financial Disclosure Rule in the instant case, however, seeks information only from shareholders, officers, or directors of medallion-owning corporations, not from their family members who do not have an interest in such a corporation.[3] As applied to the shareholders, officers, and directors of taxi companies, the Financial Disclosure Rule passes the test of *McVane.* It is reasonably related both to ascertaining whether the businesses are adequately capitalized and whether they are "dominated" corporations, and to preventing medallion owners from hiding assets in anticipation of tort judgments.

Third, and as discussed above, plaintiffs rely on their status as "private citizens" to weight the scales in their favor. We find, however, that the fact that plaintiffs are nominally "private" parties does not much alter the balance in this case. Plaintiffs have chosen to enter the heavily regulated taxi industry. As a result, their interest in confidentiality is not significantly greater than that of a government employee like those in *Barry*—although it may well be greater than that of an elected official who has chosen to place himself or herself in the limelight, *see Kaplan*, 759 F.2d at 261. And while the government's interest in financial disclosure is different in the case

---

**1.** The Statharoses' businesses are the kind of business that might well be subject to scrutiny under the veil-piercing doctrine. Three of the corporations in which the Statharoses have an interest are wholly owned by the three of them; two of those are wholly owned by Dorothy. Of course, the mere fact that the companies are small, closely-held corporations does not justify piercing the veil, but it suggests the possibility that the corporations might be alter egos of an individual or a family—a possibility that would need to be investigated through attention to the factors listed in *Passalacqua,* including undercapitalization.

**2.** Although plaintiffs claim that post-judgment discovery would be more effective in piercing the corporate veil than would disclosure statements, this argument, even if valid, is not enough to justify finding the regulation unconstitutional. Under intermediate scrutiny,

the regulation need not be narrowly tailored, but must merely bear some reasonable relationship to the regulatory goal, *see, e.g., Eisenbud,* 841 F.2d at 46, as the Financial Disclosure Rule does.

**3.** The Form does ask for information about outstanding civil judgments or tax liens against the spouses or unemancipated children of applicants (presumably because applicants might in some circumstances be personally liable for such judgments or liens). This requirement *is* close to the line under *McVane.* Nevertheless, given that the inquiry into spouses' and children's finances is limited to information regarding outstanding judgments or liens, it does not, in and of itself, render the Financial Disclosure Rule so "very wide of any reasonable mark" as to justify granting the sweeping injunction sought by plaintiffs.

of medallion owners than in the case of public employees, we cannot say that it is a lesser interest.

We conclude that the Financial Disclosure Rule hits near enough to the target to pass constitutional muster. Accordingly, as to the initial disclosure to the Commission, the plaintiffs have failed to demonstrate a likelihood of success on the merits of their privacy claim.

■■■ *2. Disclosure to the General Public Through FOIL Requests.*—Plaintiffs next claim that the Financial Disclosure Rule creates an unwarranted risk of disclosure of their personal financial information to the general public. Although intermediate scrutiny remains the appropriate standard of review, the plaintiffs' confidentiality interest in protecting their financial information from being revealed to the world at large is significantly greater than their interest in protecting that information from being revealed to the Commission. As we said in *Barry,* "[t]he degree of intrusion stemming from public exposure of the details of a person's life is exponentially greater than [that stemming from] disclosure to government officials." *Barry,* 712 F.2d at 1561 (quoting *Slevin v. City of New York,* 551 F.Supp. 917, 934 (S.D.N.Y.1982)) (internal quotation marks omitted).

Under New York's Freedom of Information Law (FOIL), members of the general public can file requests seeking access to medallion owners' financial disclosure statements. *See* N.Y. Pub. Off. Law § 87 (McKinney 1988 & Supp.1999). There are two levels of privacy protections that would come into play in evaluating any such request for medallion owners' Forms. First, FOIL and its implementing regulations contemplate that some information of a private nature may be exempt from disclosure. *See id.* § 89(2) (allowing for the promulgation of guidelines to prevent "unwarranted invasions of personal privacy" and providing that "[a]n unwarranted invasion of personal privacy includes ... disclosure of employment, medical or credit

histories"); 43 RCNY § 1–05(e) (providing that in responding to FOIL requests, "an agency ... may delete identifying details or may withhold records otherwise available, if deletion of identifying details is impracticable or will not, in fact, prevent an unwarranted invasion of the privacy of the person to whom the record refers"). Second, the Form itself allows filers to ask that specific information not be disclosed to the public. It provides: "If you believe that any information contained herein should be withheld from public inspection on the ground that disclosure of such information would constitute an unwarranted invasion of privacy, you may assert your basis for this claim below. The Commission will consider this claim in the event disclosure pursuant to FOIL is requested."

Although we have, in the past, upheld financial disclosure requirements that included provisions for release of financial information to the general public, those regulations contained specific procedural protections that FOIL, by itself, does not give. *See Barry,.* 712 F.2d at 1556–57; *see also Igneri,* 898 F.2d at 873; *Eisenbud,* 841 F.2d at 47; *Kaplan,* 759 F.2d at 260. Accordingly, if the only protection available to filers were the opportunity to claim on the Form that disclosure would be "an unwarranted invasion of privacy"—and in light of the lack either of any provision for notification of applicants when their information is requested, or of any written standards to guide the agency in deciding whether to release that information—it would be a closer question whether plaintiffs' privacy rights would be adequately protected. It is a question, however, that we need not decide today.

After oral argument, the Commission informed us that it plans to adopt written standards governing its review of FOIL requests for medallion owners' financial disclosure forms. Under these standards, private financial information in the Forms would not be released. Furthermore, the Commission has adopted a policy under which filers are to be notified in writing of

all FOIL requests for information from the Forms they have filed, and are to be told the identity of the person making the request. Filers will be given ten business days after notification to object to disclosure of the information sought. If, upon review of the request, the Commission decides to release any of the information contained in the Form, the filer will be notified. And no information will be released until ten business days after the filer has been told of the Commission's decision.

Given that the Commission has assured us of its intent not to divulge private financial information from the Forms, we conclude that the interaction of FOIL with the Financial Disclosure Rule does not now support granting the injunction sought by plaintiffs. While it is not certain that information from the forms will never be released under FOIL, the possibility is sufficiently remote that it need not concern us now. In the event that the Commission adopts guidelines for release of personal financial information that are less protective than those upheld in *Barry* and its progeny, plaintiffs are free to renew their facial challenge to the Rule. Moreover, because the Commission has agreed to provide filers with ten days' notice, should the Commission decide to release any information from the Forms, filers would also have the opportunity to bring an as-applied challenge to any such release of information.

\*       \*       \*

Accordingly, we AFFIRM the order of the district court, on the express understanding that, as the Commission has stipulated, it will not release private financial information (including addresses and telephone numbers of filers) contained in the Forms and will notify filers of any FOIL request for information in the Forms.