STATE OF CONNECTICUT *v.* NICHOLAS RUSSO
(SC 16430)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued May 31, 2001—officially released February 19, 2002

438

*Kevin T. Kane*, state's attorney, for the appellant (state).

*James S. Brewer*, with whom were *John T. Forrest* and, on the brief, *Matthew Allen*, certified legal intern, for the appellee (defendant).

*Alinor C. Sterling* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

PALMER, J. The state, with the permission of the trial court, appeals from the judgment of that court dismissing an information charging the defendant, Nicholas Russo, with multiple counts each of the crimes of forgery in the second degree in violation of General Statutes § 53a-139 (a) (4),[1] and obtaining a controlled

---

[1] General Statutes § 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (4) a prescription of a duly licensed physician or other person authorized to issue the same for any drug or any instrument or device used in the taking or administering of drugs for which a prescription is required by law."

General Statutes § 53a-139 (b) defines the term "drugs" for purposes of subsection (a) as "all drugs except controlled drugs as defined in [General Statutes §] 21a-240."

substance[2] by forging a prescription in violation of General Statutes § 21a-266 (a) (2).[3] The state claims that the trial court improperly granted the defendant's motion to suppress certain records of the defendant's prescriptions that the state had obtained from several pharmacies without a search warrant and without the defendant's consent. We agree with the state that the trial court improperly granted the defendant's motion to suppress the defendant's prescription records and, accordingly, reverse the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The state filed an information charging the defendant with thirty-two counts of obtaining Tylenol with codeine No. 3 (Tylenol 3), a controlled substance,[4] by forging a prescription in violation of § 21a-266 (a) (2), and thirty-two counts of forgery in the second degree in violation of § 53a-139 (a) (4).[5] The defendant moved to suppress certain records of his prescriptions that the state had obtained from several

---

[2] General Statutes § 21a-240 (9) defines "controlled substance" as "a drug, substance, or immediate precursor in schedules I to V, inclusive, of the Connecticut controlled substance scheduling regulations adopted pursuant to [General Statutes §] 21a-243 . . . ."

General Statutes § 21a-243 (c) provides in relevant part: "The Commissioner of Consumer Protection . . . may by regulation designate . . . as a controlled substance, a substance or chemical composition containing any quantity of a substance which has been found to have a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and having a tendency to promote abuse or physiological or psychological dependence or both. . . ."

[3] General Statutes § 21a-266 (a) provides in relevant part: "No person shall obtain or attempt to obtain a controlled substance or procure or attempt to procure the administration of a controlled substance . . . (2) by the forgery or alteration of a prescription . . . ."

[4] Tylenol 3 is a schedule III controlled substance. E.g., Physicians' Desk Reference (55th Ed. 2001) p. 2397; see Regs., Conn. State Agencies § 21a-243-9.

[5] The thirty-two counts of second degree forgery mirror the thirty-two counts of obtaining a controlled substance by forging a prescription. The information alleges that the defendant unlawfully obtained Tylenol 3 on various dates between October 10, 1996, and September 1, 1997.

pharmacies without a warrant and without the defendant's prior consent. The defendant's motion to suppress was predicated on his contention that he has a reasonable expectation of privacy in his prescription records and, therefore, that the state had obtained those records in violation of his rights under the fourth amendment to the United States constitution,[6] made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

The trial court conducted a preliminary hearing on the defendant's motion to suppress, limited to the issue of whether the defendant had standing to seek the suppression of prescription records in the possession of a

---

[6] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The defendant also sought suppression of his prescription records under article first, § 7, of the Connecticut constitution. The trial court, however, did not indicate whether its decision granting the defendant's motion to suppress was based on the federal constitution, the state constitution or both. On appeal, the defendant renews his claim under both the fourth amendment and article first, § 7. The defendant has failed, however, to articulate any reason why he is entitled to any greater rights under the state constitution than he is under the federal constitution. Accordingly, we limit our review to the defendant's claim under the federal constitution. See, e.g., *State* v. *Garcia*, 233 Conn. 44, 66 n.15, 658 A.2d 947 (1995).

We note that the brief submitted by the amici curiae does contain an independent state constitutional analysis of the issue presented by this appeal. That brief, however, was not filed until after the parties' briefs already had been filed with this court. The brief, therefore, is tantamount to a reply brief. We ordinarily do not address claims raised for the first time in a reply brief; see, e.g., *Bovat* v. *Waterbury*, 258 Conn. 574, 585 n.11, 783 A.2d 1001 (2001) ("[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief" [internal quotation marks omitted]); *Ramos* v. *Vernon*, 254 Conn. 799, 843–44, 761 A.2d 705 (2000) (same); and we see no reason to deviate from this policy in regard to the brief filed by the amici curiae in this case.

pharmacy. After that hearing, the court issued a written decision in which it concluded that the defendant had a constitutionally protected privacy interest in those records and, consequently, that he had standing to challenge the state's use of such records in its case-in-chief.[7]

Thereafter, the trial court held an evidentiary hearing on the defendant's motion to suppress. At the conclusion of the hearing, the trial court made the following factual findings.[8] At all times relevant to this case, the defendant was a detective with the Hartford police department. The defendant's supervisor, Lieutenant David Kenary, was the commander of the Hartford police department's crimes against persons and property unit. Marcus Brown was a diversion investigator with the federal Drug Enforcement Administration, assigned to conduct regulatory inspections of pharmacies.

On or about September 9, 1997, Kenary called Brown to arrange a meeting at the Hartford police department. The purported purpose of the meeting was to exchange information about Santo Buccheri, a Hartford physician, and his issuance of prescriptions for controlled substances. At the meeting, Kenary informed Brown that he believed that Buccheri was overprescribing controlled substances and dispensing samples to his

---

[7] "To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the [subject of the search]. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether the defendant had a reasonable expectation of privacy in the [subject of the search] requires a two part factual inquiry: first, whether the defendant has exhibited an actual subjective expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." (Citations omitted; internal quotation marks omitted.) *State v. Rodriguez*, 223 Conn. 127, 132, 613 A.2d 211 (1992). The trial court found that the defendant had satisfied this two-prong test.

[8] The trial court did not file written findings but, rather, issued its findings from the bench.

patients without maintaining proper records. Kenary asked Brown to notify him if the defendant's name surfaced during any investigation of Buccheri and provided Brown with the defendant's date of birth and home address.

Beginning on October 31, 1997, Brown went to pharmacies located in the vicinity of both Buccheri's office and the defendant's home and, without a search warrant, asked each of the pharmacies to provide him with the defendant's prescription records.[9] The records contained information about prescriptions that each pharmacy had filled for the defendant, including the name of the prescribing physician, the date on which the defendant had submitted the prescription to the pharmacy, the type and quantity of drug prescribed and the price of the drug.[10] The pharmacies complied with Brown's requests.[11] Brown later returned to each pharmacy and, again by request, obtained copies of the actual prescription forms that the defendant had presented to the pharmacies.[12]

The trial court noted that, although Brown's testimony suggested that his purpose in obtaining the defendant's pharmacy records was to rule out the defendant as a target of the investigation, other evidence presented at the hearing indicated that the defendant was the focus of the investigation. Specifically, the trial court alluded to a report prepared by Brown on November 19, 1997, that identified the defendant as the target

---

[9] Brown testified that he had requested the defendant's prescription records from five different pharmacies.

[10] The prescription records contain the same information that is found on the actual prescription forms.

[11] According to Brown, each of the pharmacists who had provided him with those records was " 'fully cooperative.' "

[12] Brown indicated that he sought and received copies of the original prescription forms because the defendant's prescription records indicated that he had obtained an excessive amount of Tylenol 3, specifically, between 7000 and 8000 tablets.

of Brown's investigation. The court also noted that, prior to preparing that report, Brown had not requested *records of Buccheri's prescribing practices* but, instead, had requested only *the defendant's prescription records*. The trial court found that the purpose of Brown's investigation was to determine whether the defendant had been abusing controlled substances, and that Buccheri was under investigation only because he was the defendant's physician. Accordingly, the trial court determined that Brown was not conducting an administrative inspection of the pharmacy pursuant to 21 U.S.C. § 880[13] when he obtained the defendant's pre-

---

[13] Title 21 of the United States Code, § 880, provides: "Administrative inspections and warrants

"(a) 'Controlled premises' defined

"As used in this section, the term 'controlled premises' means—

"(1) places where original or other records or documents required under this subchapter are kept or required to be kept, and

"(2) places, including factories, warehouses, and other establishments, and conveyances, where persons registered under section 823 of this title (or exempt from registration under section 822(d) of this title or by regulation of the Attorney General) or regulated persons may lawfully hold, manufacture, distribute, dispense, administer, or otherwise dispose of controlled substances or listed chemicals or where records relating to those activities are maintained.

"(b) Grant of authority; scope of inspections

"(1) For the purpose of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this subchapter and otherwise facilitating the carrying out of his functions under this subchapter, the Attorney General is authorized, in accordance with this section, to enter controlled premises and to conduct administrative inspections thereof, and of the things specified in this section, relevant to those functions.

"(2) Such entries and inspections shall be carried out through officers or employees (hereinafter referred to as 'inspectors') designated by the Attorney General. Any such inspector, upon stating his purpose and presenting to the owner, operator, or agent in charge of such premises (A) appropriate credentials and (B) a written notice of his inspection authority (which notice in the case of an inspection requiring, or in fact supported by, an administrative inspection warrant shall consist of such warrant), shall have the right to enter such premises and conduct such inspection at reasonable times.

"(3) Except as may otherwise be indicated in an applicable inspection warrant, the inspector shall have the right—

scription records but, rather, was acting in pursuance of

"(A) to inspect and copy records, reports, and other documents required to be kept or made under this subchapter;

"(B) to inspect, within reasonable limits and in a reasonable manner, controlled premises and all pertinent equipment, finished and unfinished drugs, listed chemicals, and other substances or materials, containers, and labeling found therein, and, except as provided in paragraph (4) of this subsection, all other things therein (including records, files, papers, processes, controls, and facilities) appropriate for verification of the records, reports, and documents referred to in clause (A) or otherwise bearing on the provisions of this subchapter; and

"(C) to inventory any stock of any controlled substance or listed chemical therein and obtain samples of any such substance or chemical.

"(4) Except when the owner, operator, or agent in charge of the controlled premises so consents in writing, no inspection authorized by this section shall extend to—

"(A) financial data;

"(B) sales data other than shipment data; or

"(C) pricing data.

"(c) Situations not requiring warrants

"A warrant under this section shall not be required for the inspection of books and records pursuant to an administrative subpoena issued in accordance with section 876 of this title, nor for entries and administrative inspections (including seizures of property)—

"(1) with the consent of the owner, operator, or agent in charge of the controlled premises;

"(2) in situations presenting imminent danger to health or safety;

"(3) in situations involving inspection of conveyances where there is reasonable cause to believe that the mobility of the conveyance makes it impracticable to obtain a warrant;

"(4) in any other exceptional or emergency circumstance where time or opportunity to apply for a warrant is lacking; or

"(5) in any other situations where a warrant is not constitutionally required.

"(d) Administrative inspection warrants; issuance; execution; probable cause

"Issuance and execution of administrative inspection warrants shall be as follows:

"(1) Any judge of the United States or of a State court of record, or any United States magistrate judge, may, within his territorial jurisdiction, and upon proper oath or affirmation showing probable cause, issue warrants for the purpose of conducting administrative inspections authorized by this subchapter or regulations thereunder, and seizures of property appropriate to such inspections. For the purposes of this section, the term 'probable cause' means a valid public interest in the effective enforcement of this subchapter or regulations thereunder sufficient to justify administrative

a criminal investigation of the defendant in cooperation with the Hartford police department.

The trial court further concluded that, inasmuch as Brown's conduct in obtaining the defendant's prescrip-

inspections of the area, premises, building, or conveyance, or contents thereof, in the circumstances specified in the application for the warrant.

"(2) A warrant shall issue only upon an affidavit of an officer or employee having knowledge of the facts alleged, sworn to before the judge or magistrate judge and establishing the grounds for issuing the warrant. If the judge or magistrate judge is satisfied that grounds for the application exist or that there is probable cause to believe they exist, he shall issue a warrant identifying the area, premises, building, or conveyance to be inspected, the purpose of such inspection, and, where appropriate, the type or property to be inspected, if any. The warrant shall identify the items or types of property to be seized, if any. The warrant shall be directed to a person authorized under subsection (b)(2) of this section to execute it. The warrant shall state the grounds for its issuance and the name of the person or persons whose affidavit has been taken in support thereof. It shall command the person to whom it is directed to inspect the area, premises, building, or conveyance identified for the purpose specified, and, where appropriate, shall direct the seizure of the property specified. The warrant shall direct that it be served during normal business hours. It shall designate the judge or magistrate judge to whom it shall be returned.

"(3) A warrant issued pursuant to this section must be executed and returned within ten days of its date unless, upon a showing by the United States of a need therefor, the judge or magistrate judge allows additional time in the warrant. If property is seized pursuant to a warrant, the person executing the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return of the warrant shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the person making such inventory, and shall be verified by the person executing the warrant. The judge or magistrate judge, upon request, shall deliver a copy of the inventory to the person from whom or from whose premises the property was taken and the applicant for the warrant.

"(4) The judge or magistrate judge who has issued a warrant under this section shall attach to the warrant a copy of the return and all papers filed in connection therewith and shall file them with the clerk of the district court of the United States for the judicial district in which the inspection was made." 21 U.S.C. § 880 (1994).

tion records constituted a search in the course of a criminal investigation, Brown was required to obtain either a search warrant or the defendant's prior consent. Because Brown had obtained neither, the court granted the defendant's motion to suppress.

Thereafter, the trial court granted the state's motion to dismiss the information for lack of sufficient evidence. The trial court also granted the state's motion for permission to appeal. See General Statutes § 54-96.[14] This appeal followed.[15]

On appeal, the state does not challenge the trial court's findings of fact.[16] Rather, the state contests the legal conclusions rendered by the trial court on the basis of those factual findings. In particular, the state claims that Brown legally obtained the defendant's prescription records without a warrant or the defendant's consent, upon the consent of the pharmacists who voluntarily turned those records over to Brown. The state further claims that the defendant's fourth amendment rights were not violated when Brown, acting as a criminal investigator in concert with the Hartford police, requested and received those prescription records without a search warrant or the defendant's consent. Although we acknowledge that, in general, the defendant has a constitutionally protected privacy interest

[14] General Statutes § 54-96 provides: "Appeals from the rulings and decisions of the Superior Court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the Supreme Court or to the Appellate Court, in the same manner and to the same effect as if made by the accused."

[15] The state appealed to the Appellate Court, and we granted the defendant's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 and Practice Book § 65-2.

[16] The state does contend, however, that the record does not support the trial court's conclusion that the defendant had demonstrated a subjective expectation of privacy in his prescription records. See footnote 7 of this opinion. For purposes of this appeal, we accept as true the trial court's finding regarding the defendant's subjective expectation of privacy in those records.

in his prescription records, we nevertheless conclude that his privacy rights were not violated in this particular case.

## I

We first address the issue of whether Brown, acting in conjunction with the Hartford police, had statutory authority to obtain records of the defendant's prescriptions for controlled substances in connection with the criminal investigation of the defendant.[17] Specifically, the state claims that a law enforcement official legally may obtain records of prescriptions for controlled substances from a pharmacist upon that pharmacist's consent, without a warrant and without the consent of the person for whom the prescription has been issued. The defendant, in contrast, maintains that law enforcement personnel are not vested with the authority to review prescription records without a warrant. We agree with the state.

The state's claim raises an issue of statutory construction over which our review is plenary. E.g., *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 26, 717 A.2d 77 (1998). "Our resolution of [this claim] is governed by well established principles. [I]t is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute

---

[17] For purposes of this appeal, we limit our analysis to the issue of whether law enforcement officials are authorized to obtain records of prescriptions for *controlled substances* without a warrant or the consent of the person to whom the controlled substances are prescribed. Because the present case involves prescriptions for controlled substances only, it is unnecessary to decide whether law enforcement officials lawfully may obtain records of prescriptions for medications that do not fall within a controlled substance category of drugs. See, e.g., *Bortner* v. *Woodbridge,* 250 Conn. 241, 251 n.13, 736 A.2d 104 (1999) (court need not decide issues unnecessary to resolution of case).

itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 403, 780 A.2d 903 (2001).

General Statutes § 21a-265[18] provides in relevant part that "[p]rescriptions . . . shall be open for inspection only to federal, state, county and municipal officers, whose duty it is to enforce the laws of this state or of the United States relating to controlled substances, and to third party payors having a formal agreement or contract to audit such prescriptions . . . in connection with claims submitted to such payors. . . ." General Statutes § 21a-265 further provides that "[n]o such officer or third party payor having knowledge by virtue of his office of any such prescription . . . shall divulge such knowledge, except in connection with a civil action or criminal prosecution in court or before a licensing or registration board or officer, to which action, prosecution or proceeding the person to whom such prescriptions . . . relate is a party."

By its plain language, § 21a-265 affirmatively authorizes federal, state and local law enforcement personnel

---

[18] General Statutes § 21a-265 provides: "Prescriptions, orders and records required by sections 21a-243 to 21a-282, inclusive, and stocks of controlled substances shall be open for inspection only to federal, state, county and municipal officers, whose duty it is to enforce the laws of this state or of the United States relating to controlled substances, and to third party payors having a formal agreement or contract to audit such prescriptions, orders and records in connection with claims submitted to such payors. No such officer or third party payor having knowledge by virtue of his office of any such prescription, order or record shall divulge such knowledge, except in connection with a civil action or criminal prosecution in court or before a licensing or registration board or officer, to which action, prosecution or proceeding the person to whom such prescriptions, orders or records relate is a party."

to review prescription records, in direct contravention of the construction that the defendant advances.[19] In light of the trial court's finding that Brown was acting in concert with the Hartford police when he obtained the defendant's prescription records, Brown was authorized, under § 21a-265, to obtain those records with the pharmacists' consent.

General Statutes § 21a-265 broadly provides that prescription records shall be *"open for inspection* . . . to federal, state, county and municipal officers, whose duty it is to enforce the [federal and state drug laws] . . . ." (Emphasis added.) Because the legislature has not defined the words "open for inspection," we look "to the common understanding of [those words] as expressed in a dictionary." (Internal quotation marks omitted.) *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 696, 755 A.2d 850 (2000); see General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly").

"Open" is defined as "so arranged or governed as to permit ingress, egress, or passage . . . completely free from concealment: exposed to general or particular perception or knowledge . . . available to us . . . ." Webster's Third New International Dictionary. "Inspection" is "the act or process of inspecting" and "inspect" means "to view closely and critically (as in order to ascertain quality or state, detect errors, or otherwise appraise): examine with care: scrutinize . . . ." Id.

---

[19] The defendant construes § 21a-265 as authorizing only *regulatory* personnel to inspect prescription records in accordance with the requirements of General Statutes § 21a-261; see footnote 26 of this opinion; and its federal analogue, 21 U.S.C. § 880. See footnote 13 of this opinion.

Therefore, in construing the language of § 21a-265 according to its plain and ordinary meaning, as we must, we find it apparent that the legislature intended for both criminal law enforcement officials and regulatory personnel to have access to prescription records in connection with the lawful discharge of their duties.[20] Moreover, we note the absence in § 21a-265 of any limitation on access to such records by law enforcement personnel who have obtained a search warrant. We conclude that the legislature did not intend such a limitation because if it had, it easily could have expressed that intent. E.g., *Connelly* v. *Commissioner of Correction*, supra, 258 Conn. 410. Indeed, the legislature has deemed it appropriate, in certain circumstances, to relax statutory confidentiality requirements when the information sought is the subject of a search warrant. See, e.g., General Statutes § 31-128f (2) (employer may

[20] Of course, the state's interest in reviewing prescription records in the possession of a pharmacist is subject to the right of the *pharmacist* to be free from an unreasonable search of his business premises. See, e.g., *New York* v. *Burger*, 482 U.S. 691, 699, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987). It is undisputed, however, that the pharmaceutical industry is pervasively regulated, and, therefore, warrantless administrative inspections of pharmacies are permissible as long as those inspections are conducted subject to reasonable legislative or administrative standards. See, e.g., id., 703; *Donovan* v. *Dewey*, 452 U.S. 594, 599, 101 S. Ct. 2534, 69 L. Ed. 2d 262 (1981). Thus, 21 U.S.C. § 880; see footnote 13 of this opinion; and General Statutes § 21a-261; see footnote 26 of this opinion; were enacted to protect pharmacists from unreasonable, warrantless intrusions by federal and state regulatory personnel responsible for administrative inspections of pharmacy records and stocks of controlled substances. These provisions entitle such personnel to enter a pharmacy without a search warrant to audit the pharmacy's records and its stock of controlled substances only at reasonable times and within reasonable limits. See generally 21 U.S.C. § 880 (b) (1994); General Statutes § 21a-261 (b). In the present case, however, the pharmacists who voluntarily complied with Brown's requests for the records of the defendant's prescriptions for controlled substances make no claim that Brown's lawful entry into their pharmacies, during working hours, violated *their* rights, thereby entitling *them* to suppression of the records. Because the defendant's rights, and not the pharmacists' rights, are at issue in the present case, the administrative inspection provisions of 21 U.S.C. § 880 and § 21a-261 provide no support for the defendant's claim.

disclose employee's otherwise confidential personnel or medical records pursuant to search warrant); General Statutes § 36a-44 (8) (financial institution authorized to disclose otherwise confidential information regarding customer records pursuant to search warrant); General Statutes § 38a-988 (h) (insurer may disclose otherwise confidential information concerning insured pursuant to search warrant). Finally, and importantly, the legislative history of § 21a-265 contains no suggestion that the legislature intended for that statutory provision to be construed in a manner other than according to its plain language.

Our conclusion that § 21a-265 allows law enforcement officials access to records of prescriptions for controlled substances is buttressed by other provisions of the statutory scheme regulating the lawful dispensing and use of controlled substances. For example, General Statutes § 21a-250 (a)[21] provides in relevant part that a prescription must be "retained on file by the proprietor of the pharmacy in which it is filled for a period of three years, so as to be *readily accessible for inspection by any public officer or employee engaged in the enforcement of* . . . chapter [420b of the General Stat-

---

[21] General Statutes § 21a-250 (a) provides: "A pharmacist, in good faith, may sell and dispense controlled substances to any person upon a prescription of a physician or dentist, podiatrist, optometrist, veterinarian, physician assistant licensed pursuant to section 20-12b, advanced practice registered nurse, or nurse-midwife to the extent that they are authorized to prescribe such controlled substances. Except as otherwise provided by regulations adopted pursuant to section 21a-244, the person filling or refilling the prescription shall include the date of filling and the person's signature or initials on any prescription for controlled substances, and the prescription shall be retained on file by the proprietor of the pharmacy in which it is filled for a period of three years, so as to be readily accessible for inspection by any public officer or employee engaged in the enforcement of this chapter. The prescription shall not be filled or refilled unless permitted by federal food and drug laws, the federal Controlled Substances Act and regulations adopted under this chapter."

utes]. . . ."[22] (Emphasis added.) Because chapter 420b of the General Statutes includes, inter alia, this state's criminal drug laws, it is evident that a central purpose of the record retention requirement of § 21a-250 (a) is to ensure that prescriptions will be "accessible for inspection" by law enforcement officials responsible for enforcing those laws.

In addition, General Statutes § 20-626,[23] which mandates the confidentiality of pharmacy records, contains seven separate exceptions to the general rule. One such

---

[22] Under General Statutes § 21a-249 (k), pharmacies also are required to "file filled prescriptions for controlled substances separately from other prescriptions." General Statutes § 21a-249 (k) further provides that "[a]ll schedule II prescriptions shall be filed in a separate file. All schedule III, IV and V prescriptions shall be filed in another separate file except as otherwise provided for in regulations adopted pursuant to section 21a-244. Such controlled substance prescriptions shall, immediately upon filling, be filed chronologically and consecutively."

[23] General Statutes § 20-626 provides: "(a) No pharmacist or pharmacy shall reveal any records or information concerning the nature of pharmaceutical services rendered to a patient without the oral or written consent of the patient or the patient's agent. If a patient or a patient's agent gives oral consent to release records or information, the pharmacist shall promptly record, in writing or in electronic data base form, the oral consent by listing the patient's name, the name of the patient's agent, if applicable, the date and the nature of the records or information released.

"(b) Notwithstanding subsection (a) of this section, a pharmacist or pharmacy may provide pharmacy records or information to the following: (1) The patient; (2) the prescribing practitioner or a pharmacist or another prescribing practitioner presently treating the patient when deemed medically appropriate; (3) a person registered or licensed pursuant to chapter 378 who is acting as an agent for a prescribing practitioner that is presently treating the patient or a person registered or licensed pursuant to chapter 378 providing care to the patient in a hospital; (4) third party payors who pay claims for pharmaceutical services rendered to a patient or who have a formal agreement or contract to audit any records or information in connection with such claims; (5) any governmental agency with statutory authority to review or obtain such information; (6) any individual, the state or federal government or any agency thereof or court pursuant to a subpoena; and (7) any individual, corporation, partnership or other legal entity which has a written agreement with a pharmacy to access the pharmacy's database provided the information accessed is limited to data which does not identify specific individuals."

exception authorizes pharmacists to "provide pharmacy records or information to . . . any governmental agency with statutory authority to review or obtain such information . . . ." General Statutes § 20-626 (b) (5). When § 20-626 (b) (5) is read in conjunction with § 21a-265, it is apparent that this exception is applicable to law enforcement officials charged with enforcing the criminal laws relating to controlled substances. Moreover, General Statutes § 20-626 (b) (6) authorizes pharmacists to provide prescription records to "any individual, the state or federal government or any agency thereof or court pursuant to a subpoena . . . ." It would have been illogical for the legislature to require state and federal law enforcement officials to obtain a search warrant for prescription records under § 21a-265, as the defendant maintains it did, and, at the same time, broadly authorize the dissemination of those records under § 20-626 (b) (6) to *any* person or state or federal agency seeking discovery of such information pursuant to a subpoena. See, e.g., *Modern Cigarette, Inc.* v. *Orange*, 256 Conn. 105, 120, 774 A.2d 969 (2001) (statutes are construed using common sense and assuming legislature intended reasonable and rational result).

Furthermore, General Statutes § 21a-274[24] provides that the commissioners of public health and consumer

---

[24] General Statutes § 21a-274 provides: "(a) The Commissioners of Public Health and Consumer Protection and their authorized agents, police officers within their respective jurisdictions and all state's attorneys and prosecuting attorneys shall cooperate with each other and with other agencies charged with the enforcement of the laws of the United States, of this state and all other jurisdictions relative to controlled substances.

"(b) Notwithstanding the provisions of section 21a-265 and chapter 55 said commissioners and their authorized agents may, in carrying out their duties under subsection (a), (1) exchange information relating to the issuance, suspension or revocation of a license issued by their respective agencies, or (2) exchange investigative information relating to violations of this chapter with each other, with state's attorneys and with other agencies charged with the enforcement of the laws of the United States, and of this state and all other jurisdictions relative to controlled substances."

protection, police officers and all state prosecutors shall cooperate with each other and exchange investigative information relating to criminal violations of the drug laws. This broad statutory mandate is inconsistent with the defendant's construction of § 21a-265:[25] it is unlikely that the legislature would have severely restricted a law enforcement official's access to records of prescriptions for controlled substances by requiring that official to obtain a search warrant, but nevertheless would have granted regulatory personnel full and open access to those records without the need to obtain a warrant; see General Statutes § 21a-261;[26] when § 21a-

---

[25] See footnote 19 of this opinion.

[26] General Statutes § 21a-261 provides: "(a) Every person required by section 21a-254 to prepare or obtain and keep records of controlled substances, and any carrier maintaining records with respect to any shipment containing any controlled substance, and every person in charge, or having custody, of such records shall, upon request of the Commissioner of Consumer Protection and his authorized agents, permit said commissioner and his authorized agents at reasonable times to have access to and copy such records.

"(b) For the purposes of verification of such records and of the enforcement of this part, said commissioner and his agents, are authorized to enter, at reasonable times, any place, clinic, infirmary, correctional institution, care-giving institution, pharmacy, drug room, office, hospital, laboratory, factory, warehouse, establishment or vehicle in which any controlled substance is held, manufactured, compounded, processed, sold, delivered or otherwise disposed of and to inspect, within reasonable limits and in a reasonable manner, such place, clinic, infirmary, correctional institution, care-giving institution, pharmacy, drug room, office, hospital, laboratory, factory, warehouse, establishment or vehicle, and all pertinent equipment, finished and unfinished material, containers and labeling, and all things therein including records, files, papers, processes, controls and facilities, and to inventory any stock of any such controlled substance therein and obtain samples of any such substance, any labels or containers for such substance and of any finished and unfinished material.

"(c) No inspection authorized by subsection (b) shall extend to (1) financial data, (2) sales data other than shipment data, (3) pricing data, (4) personnel data or (5) research data and secret processes or apparatus.

"(d) The Commissioner of Consumer Protection and his authorized agents are authorized and empowered to obtain and serve search warrants and arrest warrants; to seize contraband controlled substances; and to make arrests without warrant for offenses under sections 21a-243 to 21a-282, inclusive, if the offense is committed in their presence or, in the case of a

274 authorizes those same regulatory officials to provide law enforcement officials with any and all information regarding possible violations of the drug laws that they may obtain from their review of the prescription records. Moreover, the fact that the regulatory officers *themselves* have criminal investigatory and arrest powers further undermines the defendant's interpretation of § 21a-265. See General Statutes § 21a-261 (d).

Finally, the defendant's construction of § 21a-265 is fundamentally flawed for another important .reason: that interpretation renders the entire first sentence of § 21a-265 superfluous. In the defendant's view, § 21a-265 simply limits access to records of prescriptions for controlled substances to federal, state, county and municipal officers. The legislature, however, already has provided for the confidentiality of prescription records under § 20-626; see footnote 23 of this opinion; the provisions of which accomplish what the defendant contends that the legislature sought to achieve with the first sentence of § 21a-265. In light of the well established principle that statutory provisions should not be read so as to render them meaningless, unnecessary or superfluous; see, e.g., *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 196, 708 A.2d 1371 (1998); *State* v. *State Employees' Review Board*, 239 Conn. 638, 654, 687 A.2d 134 (1997); we conclude that the defendant's construction of § 21a-265 is untenable.

In support of his construction, the defendant contends that reading § 21a-265 to authorize the warrantless access by law enforcement officials to records of prescriptions for controlled substances would raise

felony, if they have probable cause to believe that the person so arrested has committed, or is committing, such offense. The commissioner and his authorized agents when executing the powers authorized pursuant to this subsection, except when using deadly physical force, shall be deemed to be acting in the capacity of a peace officer as defined in subsection (9) of section 53a-3."

constitutional concerns under *New York* v. *Burger*, 482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987), in which the United States Supreme Court concluded that pervasively regulated businesses are subject to warrantless inspections by regulatory personnel as long as those inspections are accomplished in a reasonable manner. See id., 703. This argument is without merit. As we have indicated; see footnote 20 of this opinion; the standards enunciated in *Burger* are in place to protect the fourth amendment rights of the *proprietors* of pervasively regulated businesses; see *New York* v. *Burger*, supra, 702–703; who, in the present case, are the pharmacists who voluntarily complied with Brown's requests for the defendant's prescription records. Thus, § 21a-265 does not violate the pharmacist's rights because it merely authorizes law enforcement personnel to review records of prescriptions for controlled substances upon lawfully obtaining them from a pharmacist; § 21a-265 *does not require* a pharmacist to comply with a request by law enforcement officials to review prescription records in the pharmacist's possession.[27] Thus, our interpretation of § 21a-265 in accordance with its plain language, which distinctly authorizes federal, state and local enforcement personnel to review prescription records in carrying out their official duties, is not contrary to the dictates of *Burger* because § 21a-265 simply does not implicate the fourth amendment rights of a pharmacist who, as in the present case, *voluntarily* complies with a law enforcement official's request for prescription records.[28]

[27] Thus, if a pharmacist were to refuse to comply with a request by a law enforcement official to review prescription records in that pharmacist's possession, the law enforcement official would be required to seek court approval to obtain the records. Of course, such records also would be subject to inspection by state regulatory personnel in connection with an otherwise lawful administrative inspection of the pharmacy. See General Statutes § 21a-261.

[28] The trial court relied on the principles enunciated in *Burger* in concluding that the defendant was entitled to suppression of the prescription records. That reliance is misplaced, however, because, in the present case,

In sum, we conclude that § 21a-265 authorizes law enforcement officials to obtain records of prescriptions for controlled substances from a pharmacist without a warrant, subject, of course, to consideration of the pharmacist's constitutional rights. Although, arguably, as a matter of public policy, the law enforcement officials *should* be required to obtain prior court approval or the prior consent of the person whose prescription records are sought before gaining access to those records, it is not this court's prerogative to adopt such a policy in the face of an unequivocal legislative mandate to the contrary. In light of our conclusion, however, it remains for this court to determine whether § 21a-265 gives rise to an unconstitutional invasion of the defendant's privacy rights by having authorized pharmacists to release to Brown records of the defendant's prescriptions for controlled substances.[29] We now turn to that issue.

## II

The state claims that the trial court improperly concluded that the defendant's constitutional right of privacy was violated when Brown obtained the defendant's prescription records without a search warrant and without the defendant's consent. We agree.

In *Griswold* v. *Connecticut*, 381 U.S. 479, 485, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), the United States Supreme Court first recognized a constitutionally pro-

the privacy rights of the defendant, a customer of the pharmacy, as opposed to the privacy rights of the pharmacist himself, are at issue.

[29] Because the defendant does not agree that § 21a-265 authorizes the police to obtain records of prescriptions for controlled substances without a warrant, even upon the consent of the pharmacist, the defendant has not addressed the constitutionality of that provision as so interpreted. Although we disagree with the defendant regarding the import of § 21a-265, we are in agreement, of course, that the dispositive issue presented by this appeal concerns the constitutionality of the conduct of the Hartford police, acting by and through Brown, in obtaining the defendant's prescription records, regardless of whether that conduct was statutorily authorized.

tected right of privacy. In *Griswold*, the court concluded that a state law barring the use of contraceptives by married couples violated that right. Id. The United States Supreme Court subsequently confirmed that that right of privacy "is founded in the Fourteenth Amendment's concept of personal liberty . . . ." (Citation omitted.) *Whalen* v. *Roe*, 429 U.S. 589, 598–99 n.23, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977); see also *Roe* v. *Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) (right of privacy "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action"). "Although the [United States Supreme] [C]ourt has . . . construed this right to privacy narrowly . . . it has held that personal rights that are implicit in the concept of ordered liberty . . . or deeply rooted in this Nation's history and tradition are included in this guarantee of personal privacy." (Citation omitted; internal quotation marks omitted.) *In re Michaela Lee R.*, 253 Conn. 570, 599, 756 A.2d 214 (2000).

Though the boundaries of the constitutional right of privacy have not been delineated clearly, cases involving that right generally have addressed two distinct interests: "[o]ne is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen* v. *Roe*, supra, 429 U.S. 599–600; see also *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 457, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977) (reaffirming right of privacy in avoiding disclosure of personal matters). The present case involves the first of these two interests, which "can be characterized as a right to confidentiality, [as] distinguish[ed] . . . from the right to autonomy and independence in decision-making for personal matters . . . ."[30] *Doe* v. *New York*, 15 F.3d 264, 267 (2d Cir. 1994).

---

[30] At least one federal Circuit Court of Appeals has expressed "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information." *American Federation of Government Employees,*

A majority of the federal Circuit Courts of Appeals have concluded that this constitutionally protected right to confidentiality extends to medical information or records. E.g., *Herring* v. *Keenan*, 218 F.3d 1171, 1175 (10th Cir. 2000), cert. denied, 534 U.S. 840, 122 S. Ct. 96, 151 L. Ed. 2d 56 (2001); *Doe* v. *Southeastern Pennsylvania Transportation Authority*, 72 F.3d 1133, 1137 (3d Cir. 1995), cert. denied, 519 U.S. 808, 117 S. Ct. 51, 136 L. Ed. 2d 15 (1996); *Anderson* v. *Romero*, 72 F.3d 518, 522 (7th Cir. 1995); *Doe* v. *New York*, supra, 15 F.3d 267 (Second Circuit Court of Appeals); *Doe* v. *Attorney General of the United States*, 941 F.2d 780, 795–96 (9th Cir. 1991), vacated on other grounds sub nom. *Reno* v. *Doe*, 518 U.S. 1014, 116 S. Ct. 2543, 135 L. Ed. 2d 1064 (1996); see also *Harris* v. *Thigpen*, 941 F.2d 1495, 1513 (11th Cir. 1991) (assuming such right exists). Contra *Jarvis* v. *Wellman*, 52 F.3d 125, 126 (6th Cir. 1995) (holding that constitutional right of privacy does not apply to medical records). Moreover, some courts specifically have concluded that prescription records are the type of medical record that falls within the zone of privacy protected by the constitution. E.g., *Doe* v. *Southeastern Pennsylvania Transportation Authority*, supra, 1138; *State* v. *Welch*, 160 Vt. 70, 78, 624 A.2d 1105 (1992); cf. *Whalen* v. *Roe*, supra, 432 U.S. 600–602.

*AFL-CIO* v. *Dept. of Housing & Urban Development*, 118 F.3d 786, 791 (D.C. Cir. 1997) (noting that United States Supreme Court cases discussing this right have done so in dicta only). The vast majority of federal courts, however, expressly have recognized the existence of a constitutional right of privacy with respect to the nondisclosure of personal data or information. E.g., *Sterling* v. *Minersville*, 232 F.3d 190, 196 (3d Cir. 2000); *Denius* v. *Dunlap*, 209 F.3d 944, 955 (7th Cir. 2000); *Statharos* v. *New York City Taxi & Limousine Commission*, 198 F.3d 317, 322–23 (2d Cir. 1999); *In re Crawford*, 194 F.3d 954, 958–59 (9th Cir. 1999), cert. denied sub nom. *Ferm* v. *United States Trustee*, 528 U.S. 1189, 120 S. Ct. 1244, 146 L. Ed. 2d 102 (2000); *Kallstrom* v. *Columbus*, 136 F.3d 1055, 1061–62 (6th Cir. 1998); *Eagle* v. *Morgan*, 88 F.3d 620, 625 (8th Cir. 1996); *Cantu* v. *Rocha*, 77 F.3d 795, 806 (5th Cir. 1996); *Sheets* v. *Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir.), cert. denied, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 34 (1995); *Walls* v. *Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990); *Daury* v. *Smith*, 842 F.2d 9, 13 (1st Cir. 1988).

Because prescription records may contain information of a private nature regarding a person's physical or mental health,[31] we agree with the defendant that, as a general matter, a person reasonably may expect that his or her prescription records or information contained therein will not be disseminated publicly. The privacy protection afforded such records or information, however, is not absolute. *Doe* v. *Southeastern Pennsylvania Transportation Authority*, supra, 72 F.3d 1138; see *Doe* v. *New York*, supra, 15 F.3d 269; *Doe* v. *Attorney General of the United States*, supra, 941 F.2d 796. "[R]ather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Doe* v. *Attorney General of the United States*, supra, 796; see also *Statharos* v. *New York City Taxi & Limousine Commission*, 198 F.3d 317, 323 (2d Cir. 1999) ("[t]his confidentiality interest is not absolute . . . and can be overcome by a sufficiently weighty government purpose"); *Doe* v. *Southeastern Pennsylvania Transportation Authority*, supra, 1138 ("[a]s with many individual rights, the right of privacy in one's prescription drug records must be balanced against important competing interests"); *Doe* v. *New York*, supra, 269 ("[the] right to confidentiality in [one's medical] status is no more absolute than the right to control access to other types of personal information"); *Daury* v. *Smith*, 842 F.2d 9, 13 (1st Cir. 1988) ("[t]he privacy right . . . [in confidential information] must often give way to considerations of public interest"). In other words, the reasonableness of a person's expectation

---

[31] It is noteworthy, however, that a prescription for a particular controlled substance will not necessarily reveal any intimate or personal details about a person's health. For example, in the present case, the sole charges against the defendant stem from his allegedly illegal conduct in obtaining Tylenol 3, a controlled substance generally prescribed for pain relief. The mere fact that the defendant obtained prescriptions for Tylenol 3 reveals nothing about the source or cause of his pain, or anything else about the state of the defendant's health.

that his or her personal or intimate medical information will not be disclosed depends upon the circumstances underlying the particular disclosure. Indeed, in the present case, the defendant does not claim that his right of privacy with respect to his prescription records is absolute, for he expressly acknowledges the right of the state to authorize systematic reviews of such records by third party payors *and* regulatory personnel, the latter of whom have, in addition to their administrative responsibilities, investigatory and arrest authority pursuant to § 21a-261 (d).

Courts generally have applied a balancing test to determine whether the disclosure of personal or confidential information is constitutionally permissible under the particular facts and circumstances presented. For example, the Second Circuit Court of Appeals has concluded that "some form of intermediate scrutiny or balancing approach is appropriate as a standard of review . . . ."[32] (Citation omitted.) *Barry* v. *New York*,

[32] The panel of the Second Circuit Court of Appeals in *Barry* v. *New York*, 712 F.2d 1554 (2d Cir.), cert. denied, 464 U.S. 1017, 104 S. Ct. 548, 78 L. Ed. 2d 723 (1983), explained its conclusion as follows: "The confidentiality branch of the right to privacy was at issue in *Whalen* v. *Roe*, supra [432 U.S. 589]. In that case, the [United States] Supreme Court upheld a New York statute authorizing the state to record the names and addresses of patients who received prescriptions for certain drugs, but stated that individuals have a protectible interest in avoiding disclosure of personal matters. [Id., 599]. The existence of that interest was reaffirmed in *Nixon* v. *Administrator of General Services*, supra, [433 U.S. 457], a case in which the [United States] Supreme Court upheld [a law] providing for the screening of former President Nixon's presidential materials to segregate official documents for public preservation from personal documents for return to Mr. Nixon.

"The nature and extent of the interest recognized in *Whalen* and *Nixon*, and the appropriate standard of review for alleged infringements of that interest, are unclear. . . . Most courts considering the question, however, appear to agree that privacy of personal matters is a protected interest . . . and that some form of intermediate scrutiny or balancing approach is appropriate as a standard of review . . . . The [United States] Supreme Court itself appeared to use a balancing test in *Nixon* v. *Administrator of General Services*, [supra, 433 U.S. 458]. Moreover, an intermediate standard of review seems in keeping both with the [United States] Supreme Court's reluctance to recognize new fundamental interests requiring a high degree

712 F.2d 1554, 1559 (2d Cir.), cert. denied, 464 U.S. 1017, 104 S. Ct. 548, 78 L. Ed. 2d 723 (1983); see also *Statharos* v. *New York City Taxi & Limousine Commission,* supra, 198 F.3d 324 (applying intermediate scrutiny); *Immediato* v. *Rye Neck School District,* 73 F.3d 454, 463 (2d Cir.), cert. denied, 519 U.S. 813, 117 S. Ct. 60, 136 L. Ed. 2d 22 (1996) (same); *Doe* v. *New York,* supra, 15 F.3d 269 (same). The Courts of Appeals for the Third and Fifth Circuits also apply this intermediate balancing approach. *Doe* v. *Southeastern Pennsylvania Transportation Authority,* supra, 72 F.3d 1139; *National Treasury Employees Union* v. *United States Dept. of the Treasury,* 25 F.3d 237, 243 n.2 (5th Cir. 1994); cf. *In re Crawford,* 194 F.3d 954, 959 (9th Cir. 1999), cert. denied sub nom. *Ferm* v. *United States Trustee,* 528 U.S. 1189, 120 S. Ct. 1244, 146 L. Ed. 2d 102 (2000) (applying comparable balancing test); *Bloch* v. *Ribar,* 156 F.3d 673, 684 (6th Cir. 1998) (same); *Hester* v. *Milledgeville,* 777 F.2d 1492, 1497 (11th Cir. 1985) (same).

Whatever may be the precise contours of the applicable balancing test, this case is controlled by *Whalen* v. *Roe,* supra, 429 U.S. 589, in which the United States Supreme Court considered a constitutional claim identical in all material respects to the claim that the defendant raises in the present case. See id., 591. The United States Supreme Court, after considering the pertinent factors, determined that the challenged disclosure of prescription information did not invade "any right or liberty protected by the Fourteenth Amendment." Id.,

of scrutiny for alleged infringements, and the Court's recognition that some form of scrutiny beyond rational relation is necessary to safeguard the confidentiality interest." (Citations omitted; internal quotation marks omitted.) *Barry* v. *New York,* supra, 712 F.2d 1559.

This court generally gives special weight to the decisions of the Second Circuit Court of Appeals in cases in which we are called upon to apply federal law. See *State* v. *Faria,* 254 Conn. 613, 625 n.12, 758 A.2d 348 (2000); cf. *Schnabel* v. *Tyler,* 230 Conn. 735, 743, 646 A.2d 152 (1994).

604. In *Whalen*, a group of patients and physicians, among others, challenged the constitutionality of a New York statutory scheme requiring physicians to forward records of prescriptions for schedule II drugs, which contained detailed patient information, to a centralized database maintained by the state department of health.[33] See generally id., 593–95. Although public disclosure of the identity of the patient was prohibited under the statutory scheme; id., 594; certain state regulatory employees and personnel responsible for investigating violations of New York's controlled substance laws[34] were afforded access to that information. See id., 595. A unanimous United States Supreme Court concluded, first, that the statutory scheme "was a reasonable exercise of New York's broad police powers"; id., 598; and enacted in furtherance of "the [s]tate's vital interest in controlling the distribution of dangerous drugs . . . ." Id. In addition, the court concluded that, in light of the statutory prohibition against the public dissemination of the prescription information, the risk of such dissemination was insufficient to invalidate the challenged statutory scheme. See id., 600–602. Although the court acknowledged that, under the statutory scheme, "private [prescription] information must be disclosed to . . . authorized [state] employees"; id., 602; it nonetheless observed that "[s]uch disclosures . . . are not . . . meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with

---

[33] The New York statutory scheme required physicians to submit a form to the state department of health that identified "the prescribing physician; the dispensing pharmacy; the drug and dosage; and the name, address, and age of the patient." *Whalen* v. *Roe*, supra, 429 U.S. 593.

[34] The court in *Whalen* noted that persons with access to the database included "investigators with authority to investigate cases of overdispensing which might be identified by the computer." *Whalen* v. *Roe*, supra, 429 U.S. 595. These investigators were employees of the New York bureau of narcotic control, an agency "empowered to investigate violations of the [New York] Public Health law and of Schedule II regulations." *Roe* v. *Ingraham*, 403 F. Sup. 931, 934 (S.D.N.Y. 1975), rev'd sub nom. *Whalen* v. *Roe*, supra, 589.

many facets of health care. Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when th[ose] disclosure[s] may reflect unfavorably on the character of the patient[s]." Id. The court then concluded that the challenged statutory scheme, in mandating the disclosure of the prescription information to representatives of the state having responsibility for the health and welfare of the community, did not create an impermissible invasion of privacy. Id., 603–604.

*Whalen* is indistinguishable from the present case. Our statutory scheme, like the New York statutory scheme considered in *Whalen,* safeguards the privacy interests of persons who obtain prescriptions for controlled substances by restricting access to those records to a limited class of persons; see General Statutes §§ 20-626 (b) and 21a-265; including public officials responsible for the enforcement of the federal and state drug laws. General Statutes § 21a-265. Both states' regimes prohibit the dissemination of such information to the general public. See General Statutes § 20-626; cf. *Whalen* v. *Roe,* supra, 429 U.S. 600. As the Second Circuit Court of Appeals recently has observed, "[t]he degree of intrusion stemming from public exposure of the details of a person's life is exponentially greater than [that stemming from] disclosure to government officials."[35] (Internal quotation marks omitted.) *Statharos*

[35] Thus, Justice William J. Brennan, in his concurring opinion in *Whalen,* distinguished between the constitutionally permissible collection of prescription data by state officials and the "[b]road dissemination" of prescription information *by* those officials, a practice that, according to Justice Brennan, "would clearly implicate constitutionally protected privacy rights, and would presumably be justified only by compelling state interests." *Whalen* v. *Roe,* supra, 429 U.S. 606 (Brennan, J., concurring). But see id., 607–609 (Stewart, J., concurring) (expressing doubt that even broad dissemi-

v. *New York City Taxi & Limousine Commission,*
supra, 198 F.3d 326, quoting *Barry* v. *New York,* supra,
712 F.2d 1561; see also *American Federation of Govern-
ment Employees, AFL-CIO* v. *Dept. of Housing & Urban
Development,* 118 F.3d 786, 793 (D.C. Cir. 1997) ("we
hold that the individual interest in protecting the privacy
of the information sought by the government is signifi-
cantly less important where the information is collected
by the government but not disseminated publicly");
*Stone* v. *Stow,* 64 Ohio St. 3d 156, 166, 593 N.E.2d 294
(1992) ("[w]hatever privacy interest . . . patients and
physicians possess in . . . prescription records is lim-
ited to the right not to have the information disclosed
to the general public"). Moreover, as in *Whalen,* nothing
in the record of the present case suggests that the law
enforcement officials authorized pursuant to § 21a-265
to obtain records of the defendant's prescriptions for
controlled substances without a warrant have failed to
abide by the stringent statutory nondisclosure provi-
sions, or that they likely will flout those provisions in
the future.[36] See *Whalen* v. *Roe,* supra, 601 (refusing to
assume that standards of nondisclosure will be
violated).

---

nation of prescription records by state officials would implicate any constitu-
tionally protected right).

[36] Of course, in the event that a law enforcement official were to abuse
his or her authority under § 21a-265 by gaining access to prescription records
for a retaliatory or other improper purpose, such illegal conduct could
provide the basis for a motion to dismiss the information on the ground of
vindictive or selective prosecution. See, e.g., *United States* v. *Sanders,* 211
F.3d 711, 717 (2d Cir. 2000); *United States* v. *Koh,* 199 F.3d 632, 640 (2d
Cir. 1999). In addition, the offending law enforcement official surely would
be subject to severe administrative sanctions. Moreover, a person who has
not committed any offense but whose prescription records have been
obtained by the police for improper or unlawful purposes likely would be
entitled to a civil recovery stemming from that misconduct. The record of
this case, however, does not establish either that the criminal investigation
of the defendant was improperly motivated or that law enforcement person-
nel ever improperly disclosed the defendant's prescription records or infor-
mation.

Furthermore, because the pharmaceutical industry is pervasively regulated, prescription information and records are legitimately subject to regular scrutiny by federal and state inspectors and, consequently, the expectation of privacy that the public has in that information or those records, in contrast to other types of information that are not subject to such intensive review and regulation, necessarily is reduced drastically.[37] See, e.g., *California* v. *Carney*, 471 U.S. 386, 392, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985) (due to pervasive regulation of vehicles capable of traveling on public highways, public has reduced privacy expectation in motor vehicles); *Condon* v. *Reno*, 155 F.3d 453, 464–65 (4th Cir. 1998) (same), rev'd on other grounds, 528 U.S. 141, 120 S. Ct. 666, 145 L. Ed. 2d 587 (2000). Indeed, the fact that § 21a-265 expressly authorizes law enforcement officials to obtain records of prescriptions for controlled substances without a warrant reflects a considered public policy judgment that, in and of itself, serves to diminish a person's expectation of privacy in such records. See, e.g., *Yin* v. *California*, 95 F.3d 864, 871 (9th Cir. 1996), cert. denied, 519 U.S. 1114, 117 S. Ct. 955, 136 L. Ed. 2d 842 (1997) (statute explicitly authorizing medical examinations of state civil service employees places those employees on notice that they can be subject to such examination, thereby diminishing their expectation of privacy accordingly); see also, e.g., *Doe* v. *Southeastern Pennsylvania Transportation Authority*, supra, 72 F.3d 1140 (existence of express statutory mandate or articulated public policy favoring disclosure of particular information is factor militating against conclusion that such disclosure constitutes cognizable invasion of privacy).

---

[37] As the United States Supreme Court emphasized in *Whalen*, the expectation of privacy that a person has in information about his or her prescriptions is reduced by virtue of the routine disclosure of that information not only to regulatory officials, but also to insurers, health care providers and hospital personnel. *Whalen* v. *Roe*, supra, 429 U.S. 602.

It is telling that the defendant has cited to no case, and we are aware of none, in which a court has held that a law enforcement official's access to prescription records violates the patient's right of privacy. Indeed, in light of *Whalen* and its progeny, it is not surprising that the only courts to have considered such a claim squarely have rejected it. *Stone* v. *Stow,* supra, 64 Ohio St. 3d 166; *State* v. *Welch,* supra, 160 Vt. 83–84. The reason is plain: *Whalen* makes it perfectly clear that a legitimate request for prescription information or records by a public official responsible for safeguarding public health and safety is a valid exercise of the state's police powers and, consequently, does not constitute an impermissible invasion of privacy. *Strong* v. *Board of Education,* 902 F.2d 208, 212 (2d Cir.), cert. denied, 498 U.S. 897, 111 S. Ct. 250, 112 L. Ed. 2d 208 (1990); *Gutierrez* v. *Lynch,* 826 F.2d 1534, 1539 (6th Cir. 1987). In other words, a person does not have an *objectively reasonable* expectation that records of his or her prescriptions for controlled substances will not be disclosed to law enforcement personnel, subject to safeguards against further dissemination of those records, upon an appropriate request for those records by such personnel.

Although the defendant concedes that he has a reduced expectation of privacy in records of his prescriptions for controlled substances owing to the existence of a regulatory scheme authorizing state and federal regulatory personnel to conduct regular inspections of those records, he nevertheless maintains that his reasonable expectation of privacy in those records is reduced only to the extent necessary to accomplish that regulatory purpose. In essence, the defendant's claim devolves into the proposition that the inspection of records of prescriptions for controlled substances by *law enforcement* personnel, as opposed to *regulatory*

personnel, violates a person's reasonable expectation of privacy in those records.

This contention simply ignores *Whalen*. In *Whalen*, the United States Supreme Court expressly acknowledged that the prescription information submitted to the state database by prescribing physicians was subject to review by state officials *authorized to investigate violations of the laws governing the dispensing of prescription medication*; *Whalen* v. *Roe*, supra, 429 U.S. 595; see footnote 34 of this opinion and accompanying text; but nevertheless concluded that the statutory scheme did not contravene the patients' privacy rights. *Whalen* v. *Roe*, supra, 602. In so holding, the court drew no distinction between the patients' rights vis-á-vis the investigators, on the one hand, and the patients' rights vis-á-vis the regulatory personnel of the New York department of health, on the other hand. See generally id. Moreover, the court in *Whalen* noted that the central reporting system at issue in that case was established to prevent *criminal* misconduct by doctors, pharmacists *and patients*.[38] See generally id., 591–92, 592 n.6.

---

[38] The court in *Whalen* explained: "Many drugs have both legitimate and illegitimate uses. In response to a concern that such drugs were being diverted into unlawful channels, in 1970 the New York Legislature created a special commission to evaluate the State's drug-control laws. The commission found the existing laws deficient in several respects. There was no effective way to prevent the use of stolen or revised prescriptions, to prevent unscrupulous pharmacists from repeatedly refilling prescriptions, to prevent users from obtaining prescriptions from more than one doctor, or to prevent doctors from over-prescribing, either by authorizing an excessive amount in one prescription or by giving one patient multiple prescriptions. In drafting new legislation to correct such defects, the commission consulted with enforcement officials in California and Illinois where central reporting systems were being used effectively." *Whalen* v. *Roe*, supra, 429 U.S. 591–92. The court further noted that the chairman of the temporary state commission to evaluate the drug laws, in his summary of the commission's findings, explained that "[l]aw enforcement officials in both California and Illinois ha[d] been consulted in considerable depth about the use of multiple prescriptions, since they ha[d] been using them for a considerable period of time. They indicate[d] to us that they are . . . a useful adjunct to the proper

Moreover, employees of the department of consumer protection who are responsible for the routine, administrative inspection of prescription records in the possession of pharmacies have full police power to enforce the state's criminal drug laws, including the authority to make arrests and seize evidence, pursuant to § 21a-261 (d). This fact underscores the artificial nature of the distinction that the defendant necessarily must draw between his conclusion that a person does not have a reasonable expectation of privacy with respect to his or her records of prescriptions for controlled substances in the context of regulatory inspections, on the one hand, and his conclusion that a person does have such an expectation of privacy in the context of inspections by law enforcement personnel, on the other hand. Both the dictates of *Whalen* and common sense compel this court to reject the defendant's claim that any such distinction is *constitutionally* significant.[39]

identification of culpable professional[s] and unscrupulous drug abusers . . . ." (Internal quotation marks omitted.) Id., 592 n.6.

[39] The defendant's flawed analysis appears to stem from his concern about the *consequences* of a targeted review of an individual's prescription records by law enforcement officials. We agree that it reasonably may be presumed that such a review is more likely to reveal criminal conduct than a routine regulatory inspection and, therefore, more likely to result in the filing of criminal charges. That fact, however, is irrelevant to the issue of whether a law enforcement official's inspection of records of a person's prescriptions for controlled substances gives rise to a privacy invasion of *constitutional* magnitude. As we discussed previously, records of an individual's prescriptions for controlled substances lawfully are subject to review by a host of different people, including state consumer protection agents empowered to investigate and arrest persons for criminal violations of the drug laws. See General Statutes § 21a-261 (d). Consequently, that individual has a greatly reduced privacy expectation in those records, and, thus, any marginal loss of privacy that an individual may suffer as a result of an inspection of his or her records of prescriptions for controlled substances in connection with a criminal investigation is insignificant in relation to the privacy invasion to which he *already* has been subjected. It is the minimal nature of that additional intrusion, not the added potential for arrest and prosecution, that governs the determination of whether the intrusion has constitutional implications.

This court's analysis in *State* v. *DeFusco*, 224 Conn. 627, 620 A.2d 746 (1993), highlights the illogic of the distinction that the defendant urges. In *DeFusco*, we upheld the constitutionality of a warrantless search of garbage that the defendant, Paul DeFusco, had placed at the curb in front of his home for collection by the garbage collector. Id., 639. We explained that DeFusco could not have had a reasonable expectation of privacy from inspection of that garbage by the police in light of the "myriad of intruders, purposeful or errant, [who] could legally have sorted through his garbage." Id., 636. We explained that "[a] person's reasonable expectations as to a particular object cannot be [so] compartmentalized . . . ." Id., 637. In the present case, the defendant concedes that he has no reasonable expectation of privacy in his prescription records protecting him against the warrantless inspection of those records by state regulatory agents and others, including third party payors. Under the reasoning of *DeFusco*, the defendant does not have a reasonable expectation of privacy in those records protecting him against warrantless inspections by *law enforcement officials* either. In other words, although an individual legitimately may expect that his records of prescriptions for controlled substances will not be disclosed to the *general public*—an expectation that the legislature has recognized as reasonable; see General Statutes §§ 20-626 and 21a-265—that same individual cannot reasonably expect that certain government officials responsible for safeguarding public health and safety *will* be permitted to review those records while other government officials with the same responsibility *will not*. It is precisely this kind of compartmentalized, bifurcated expectation of privacy that we rejected in *DeFusco*. This expectation is especially unreasonable in the present case in light of the broad law enforcement powers that § 21a-261 (d) bestows upon department of con-

sumer protection agents who are responsible for inspecting prescription records.[40]

In light of the state's strong interest in regulating and policing the distribution of potentially harmful drugs[41]—

---

[40] The dissent's assertion that footnote 32 of the majority opinion in *Whalen* v. *Roe*, supra, 429 U.S. 604, supports the conclusion that *Whalen* is distinguishable from the present case—a claim that the defendant himself has not raised—is entirely without merit. In that footnote, the court noted that the plaintiffs, relying on *Terry* v. *Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), had alleged that a constitutionally protected privacy right in their prescription information emanated not only from the due process clause of the fourteenth amendment, but also from the fourth amendment. *Whalen* v. *Roe*, supra, 604 n.32. After distinguishing the nature of the privacy rights at issue in *Terry* and *Katz*—cases that involved state intrusions into core fourth amendment values—from the confidentiality interest asserted under the facts of *Whalen*, the court then *rejected* the plaintiffs' contention that the fourth amendment provided a separate and independent basis for their claim of a constitutional right of privacy in their prescription information. Id. The dissent turns this conclusion on its head by asserting that the *refusal* of the court in *Whalen* to acknowledge a separate and distinct fourth amendment underpinning to the plaintiffs' privacy claim somehow lends support to the contention that *Whalen* does not control the present case. In misconstruing footnote 32 as it does, the dissent misperceives the import of the fourth and fourteenth amendments in relation to the defendant's claims: the defendant has a qualified right of privacy in his prescription records emanating from the fourteenth amendment; to the extent that his qualified privacy right in those records allegedly gives rise to a reasonable expectation of privacy in the particular context of a *criminal* case, he may seek to invoke the protections of the fourth amendment to suppress the *state's use* of those records against him at a criminal trial. Moreover, the dissent's reading of footnote 32 of the majority opinion in *Whalen* is wrong for yet another, more fundamental reason: it simply cannot be squared with the holding of *Whalen* that the New York statutory scheme did not violate the plaintiffs' constitutional rights even though, under that scheme, the prescription information was subject to warrantless inspections by state investigators responsible for enforcing the state's *criminal* drug laws. See *Whalen* v. *Roe*, supra, 595, 603–604.

[41] The United States Supreme Court has recognized the "severe and intractable nature of [our nation's] drug problem . . . ." *Indianapolis* v. *Edmond*, 531 U.S. 32, 42, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000); see also *In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000) (patients' privacy interests in medical files compiled by their treating physicians are outweighed by government's "compelling interest in identifying illegal activity and in deterring future misconduct").

a category into which controlled substances indisputably fall[42]—and in light of the restrictions that the statutory scheme places upon the disclosure of prescription information and records, the conclusion is inescapable that, under the holding and rationale of *Whalen,* the defendant's privacy rights were not violated when Brown obtained records of the defendant's prescriptions for controlled substances in the course of assisting the Hartford police in investigating the defendant.[43]

---

[42] See, e.g., 21 U.S.C. § 812 (b) (1994) (indicating that controlled substances, if abused, have potential to cause physical or psychological dependence); General Statutes § 21a-243 (c) (same); see also *Whalen* v. *Roe,* supra, 429 U.S. 592 (schedules of controlled substances classify potentially harmful drugs).

[43] Although the defendant himself makes no mention of the special needs cases; see, e.g., *Vernonia School District 47J* v. *Acton,* 515 U.S. 646, 653, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995); *National Treasury Employees Union* v. *Von Raab,* 489 U.S. 656, 666, 679, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989); cf. *Ferguson* v. *Charleston,* 532 U.S. 67, 84, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001); *Indianapolis* v. *Edmond,* 531 U.S. 32, 41–42, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000); the dissent relies heavily on these cases in support of its conclusion that the defendant's constitutionally protected privacy rights were violated. This reliance is misplaced. First, the dissent points to nothing in the special needs cases that casts any doubt on the continued vitality of *Whalen* v. *Roe,* supra, 429 U.S. 589, which, as we have explained, is legally indistinguishable from the present case. Furthermore, the special needs doctrine simply does not bear upon the issue raised in the present case, in which the defendant, like the patients in *Whalen,* cannot prevail on his constitutional claim because he has a drastically reduced expectation of privacy in records of his prescriptions for controlled substances in light of the extent to which those records properly are subject to inspection. See id., 602. Under the special needs doctrine, the government does not seek to justify a warrantless search or seizure on the ground that the individual subject to that intrusion already has a sufficiently reduced expectation of privacy such that a further privacy intrusion by the government is not constitutionally meaningful. To the contrary, the claimed justification for breaching the individual's *otherwise reasonable expectation of privacy* under a special needs rationale is a special need to do so that is *beyond the needs of ordinary law enforcement.* See, e.g., *National Treasury Employees Union* v. *Von Raab,* supra, 666. By contrast, in *Whalen,* the court expressly approved a statutory scheme designed specifically to assist the state in enforcing its criminal drug laws because the means chosen by the state did not violate the patients' *already reduced* expectation of privacy in their prescription records. See *Whalen* v. *Roe,* supra, 602. Thus, the

Accordingly, we conclude that the trial court improperly granted the defendant's motion to suppress the defendant's prescription records.

The judgment is reversed and the case is remanded with direction to deny the defendant's motion to suppress and for further proceedings according to law.

In this opinion KATZ and ZARELLA, Js., concurred.

SULLIVAN, C. J., with whom VERTEFEUILLE, J., joins, dissenting. The majority concludes that the warrantless search and seizure of the pharmacy records of the defendant, Nicholas Russo, by a drug enforcement agency officer, Marcus Brown, during the course of a criminal investigation did not violate the fourth amendment. I respectfully disagree.

I first note that I am puzzled by the majority's analysis of General Statutes § 21a-265.[1] On the one hand, the majority concludes that "§ 21a-265 affirmatively authorizes federal, state and local law enforcement personnel to review prescription records . . . ." On the other hand, it concludes that the statute "does not require a pharmacist to comply with a request by criminal law enforcement officials to review prescription records in the pharmacist's possession," but that such an inspection may be compelled pursuant to General Statutes § 21a-261. See footnote 27 of the majority opinion. If that is the case, I cannot perceive what affirmative authority § 21a-265 provides, nor can I perceive how the majority's reading of the statute differs from my reading that it is intended to be a shield for pharmacy owners and operators, and other persons with privacy interests in pharmacy records, not a sword for government officials seeking access to those records. Accord-

___

special needs cases relied upon by the dissent are wholly inapposite to the present case.

[1] See footnote 18 of the majority opinion for the text of General Statutes § 21a-265.

ingly, I do not see why it is necessary to consider the constitutionality of that statute or of the only statutes that, in my view, do provide government officials with affirmative authority to inspect pharmacy records, namely, § 21a-261[2] and that statute's federal counterpart, 21 U.S.C. § 880.[3] None of those statutes purports to authorize a warrantless search of pharmacy records for criminal law enforcement purposes.[4]

Rather, I would conclude that the question to be answered is whether, under the fourth amendment, the government may compel disclosure of sensitive personal information for a valid regulatory purpose and then use that information for criminal law enforcement purposes. The majority, relying on *Whalen* v. *Roe*, 429 U.S. 589, 591, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977), concludes that it may. I disagree.

In *Whalen*, the United States Supreme Court considered the constitutionality, under the fourteenth amendment, of the New York State Controlled Substances Act of 1972; N.Y. Pub. Health Law § 3300 et seq. (McKinney Sup. 1976–1977). The statute required the recording, in a centralized computer file, of the names and addresses

---

[2] See footnote 26 of the majority opinion for the text of General Statutes § 21a-261.

[3] See footnote 13 of the majority opinion for the text of 21 U.S.C. § 880.

[4] The majority states that, while § 21a-265 "affirmatively authorizes" inspection of pharmacy records, § 21a-261 and 21 U.S.C. § 880 "were enacted to protect pharmacists from unreasonable, warrantless intrusions by federal and state regulatory personnel . . . ." Footnote 20 of the majority opinion. In my opinion, this reading stands the statutes on their heads. Section 21a-261 and 21 U.S.C. § 880 constitute the regulatory scheme that *reduces* the pharmacists' expectation of privacy for fourth amendment purposes. Admittedly, those statutes contain restrictions on the authority to inspect that are dictated by the fourth amendment, but, in the absence of the statutes, the fourth amendment would prohibit *any* intrusion by the government without a warrant or the consent of the pharmacists. On the other hand, in my view, the only purpose of § 21a-265 is to protect pharmacists and other persons with privacy interests in pharmacy records from the unwarranted disclosure of the records to unauthorized persons.

of all persons who had obtained certain drugs pursuant to prescriptions from physicians. *Whalen* v. *Roe*, supra, 429 U.S. 591. The law had been enacted to correct defects in the preexisting law, under which "[t]here was no effective way to prevent the use of stolen or revised prescriptions, to prevent unscrupulous pharmacists from repeatedly refilling prescriptions, to prevent users from obtaining prescriptions from more than one doctor, or to prevent doctors from over-prescribing . . . ." Id., 592. The law was challenged by a group of patients regularly receiving prescriptions for Schedule II drugs, which include opium and opium derivatives, cocaine, methadone, amphetamines and methaqualone, by doctors who prescribed such drugs and by two associations of physicians. Id., 593 n.8, 595. They claimed that the "the statute threaten[ed] to impair their interest in the nondisclosure of private information" in violation of the fourteenth amendment. Id., 600.

The court noted that "[t]he concept of a constitutional right of privacy still remains largely undefined. There are at least three facets that have been partially revealed, but their form and shape remain to be fully ascertained. The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The second is the right of an individual not to have his private affairs made public by the government. The third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion. . . . The first of [these] facets . . . is directly protected by the Fourth Amendment; the second and third correspond to the two kinds of interests referred to in [this opinion]." (Citation omitted; internal quotation marks omitted.) Id., 599 n.24.

The court also explicitly rejected the appellees' claim, based on language in *Terry* v. *Ohio*, 392 U.S. 1, 9, 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.

Ed. 2d 576 (1967), "that a constitutional privacy right emanates from the Fourth Amendment . . . ." (Citations omitted.) *Whalen* v. *Roe*, supra, 429 U.S. 604 n.32. The court concluded that "those cases involve affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations. We have never carried the Fourth Amendment's interest in privacy as far as the Roe appellees would have us. We decline to do so now." Id. In other words, where there is no government surveillance and intrusion for criminal law enforcement purposes, the mere disclosure of personal information does not constitute an invasion of privacy under the fourth amendment.

Thus, the court in *Whalen* explicitly distinguished fourth amendment privacy interests from fourteenth amendment privacy interests and made it clear that there was no colorable fourth amendment claim in that case. Id. The court did recognize, however, that the government typically has a duty to avoid unwarranted disclosure of personal information in government files and that that duty "arguably has its roots in the Constitution . . . ." Id., 605. The court concluded that, because the New York statute adequately protected the confidentiality of the records; id.; the "record [did] not establish an invasion of any right or liberty protected by the Fourteenth Amendment." Id., 606.

The majority concludes that, under *Whalen*, because state and federal regulatory agents have access to the defendant's pharmacy records under their respective regulatory inspection schemes, he has no privacy interest in those records vis-a-vis criminal law enforcement officials. See footnote 39 of the majority opinion. In my view, however, the majority ignores the language in *Whalen* limiting the holding of that case to fourteenth amendment privacy interests. It also ignores the United States Supreme Court cases decided under the special needs doctrine that have developed and clarified the

distinction, merely referred to in *Whalen*, between the privacy interest in nondisclosure of personal information and the privacy interest in being free from government surveillance and intrusion.

In special needs cases, the question is whether a warrantless and suspicionless search is nevertheless reasonable under the fourth amendment because "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." (Internal quotation marks omitted.) *Skinner* v. *Railway Labor Executives' Assn.*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). In *Skinner*, the court considered the constitutionality of a regulation providing for the suspicionless and warrantless toxicological testing of railway workers. The court concluded that such testing was justified and did not violate the fourth amendment when the purpose was "not to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.' " Id., 620–21. The court noted, however, that the regulation under review provided in part that "[e]ach sample provided under [Subpart C] is retained for not less than six months following the date of the accident or incident and may be made available to . . . a party in litigation upon service of appropriate compulsory process on the custodian . . . ." (Internal quotation marks omitted.) Id., 621 n.5. The court further noted that "[w]hile this provision might be read broadly to authorize the release of biological samples to law enforcement authorities, the record does not disclose that it was intended to be, or actually has been, so used. Indeed, while respondents aver generally that test results might be made available to law enforcement authorities . . . they do not seriously contend that this provision, or any other part of the administrative scheme, was designed as 'a "pretext" to

enable law enforcement authorities to gather evidence of penal law violations.' *New York* v. *Burger*, 482 U.S. 691, [716–17 n.27, 107 S. Ct. 2636, 96 L. Ed. 2d 601] (1987). Absent a persuasive showing that the [Federal Railroad Administration's] testing program is pretextual, we assess the . . . scheme in light of its obvious administrative purpose. We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the [Federal Railroad Administration's] program." *Skinner* v. *Railway Labor Executives' Assn.*, supra, 621 n.5. Thus, the court in *Skinner* clearly recognized that the purpose of a search may be constitutionally significant.

In *Vernonia School District 47J* v. *Acton*, 515 U.S. 646, 650–51, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995), the United States Supreme Court considered the constitutionality of a school policy under which students who wished to play sports were required, under monitored conditions, to provide urine samples that were then tested for drugs. The court recognized that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant . . . ." (Citation omitted.) Id., 653. It also criticized the dissenting opinion in that case for "lump[ing] this search together with 'evidentiary' searches, which generally require probable cause"; id., 658–59 n.2; and emphasized that "the search here is undertaken for prophylactic and distinctly *non*-punitive purposes . . . ." (Citations omitted; emphasis in original.) Id., 658 n.2. Thus the court again clearly suggested that the purpose of the search is constitutionally significant. The court concluded that the government interest in protecting high school athletes from

adverse effects of drug use and ensuring a drug-free school justified the warrantless drug tests. Id., 664–65.

In *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 660, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989), the court considered the constitutionality of a program promulgated by the United States Customs Service that required drug testing of employees who applied for or occupied certain positions within the service. The court noted that "[i]t is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent." Id., 666. It concluded that the government's interest in ensuring the physical health and unimpeachable integrity and judgment of customs agents involved in interdiction of drug traffic justified the warrantless searches. Id., 670; see also *Griffin* v. *Wisconsin*, 483 U.S. 868, 875, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) (warrantless search of probationer's home is justified by purposes of probation, i.e., rehabilitation of probationer and protection of public); *New Jersey* v. *T. L. O.*, 469 U.S. 325, 341, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (need to maintain order in schools justifies warrantless search of student on less than probable cause standard); *Bell* v. *Wolfish*, 441 U.S. 520, 558–60, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (need for prison security justifies warrantless strip search of prisoners).

I note that in *National Treasury Employees Union* the customs service itself, like Connecticut's department of consumer protection and the federal drug enforcement agency, which are charged with administering the inspection schemes at issue in this case, had criminal law enforcement authority. See *National Treasury Employees Union* v. *Von Raab*, supra, 489 U.S. 659–60. Accordingly, the same persons who had authority to view the drug test results had authority to enforce

the drug laws. The United States Supreme Court found it constitutionally significant, however, that the test results could not be used for criminal law enforcement purposes without the employee's consent. Id., 666. Thus, even though it is clear that the employees had no protectible fourteenth amendment privacy interest in the test results vis-a-vis the service, the court clearly suggested that the employees retained a fourth amendment privacy interest in that information.

In the United States Supreme Court's recent decision in *Ferguson* v. *Charleston,* 532 U.S. 67, 70, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001), the court considered "whether the [state's] interest in using the threat of criminal sanctions to deter pregnant women from using cocaine can justify a departure from the general rule that an official nonconsensual search is unconstitutional if not authorized by a valid warrant." A task force consisting of representatives of a university hospital, the police, a local substance abuse commission and the state's department of social services had adopted a policy concerning the management of drug abuse during pregnancy. Id., 71. Under the policy, a pregnant patient was to be tested for cocaine use if she met one of nine specified criteria. Id. The policy also provided that patients who tested positive would be referred to a substance abuse clinic. Id., 72. If the patient tested positive a second time, the police were to be notified, and the patient arrested. Id.

Ten women who had been arrested after testing positive for cocaine use challenged the policy, claiming that the warrantless and nonconsensual drug tests were unconstitutional searches. Id., 73. The respondent task force members claimed that the petitioners had consented to the searches and that, as a matter of law, the searches were reasonable because they were justified by special purposes not related to law enforcement. The court did not resolve the respondents' claim that

the patients had consented to the searches, because the issue had not been addressed by the Fourth Circuit Court of Appeals. Id., 76. As to the respondents' claim that the searches were justified by "special non-law-enforcement" purposes; id., 74; the court recognized that, "in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when 'special needs' other than the normal need for law enforcement provide sufficient justification." Id., 75 n.7. It also recognized, however, that "[i]n . . . special needs cases, we have tolerated suspension of the Fourth Amendment's warrant or probable cause requirement in part because *there was no law enforcement purpose behind the searches in those cases, and there was little, if any, entanglement with law enforcement.*" (Emphasis added.) Id., 79 n.15. It concluded that "the purpose actually served by [these] searches is ultimately indistinguishable from the general interest in crime control." (Internal quotation marks omitted.) Id., 81. "While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal. The threat of law enforcement may ultimately have been intended as a means to an end, but the direct and primary purpose of [the] policy was to ensure the use of those means. In our opinion, this distinction is critical. Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose." (Emphasis in original.) Id., 82-84. The court concluded that the case "simply does not fit within the closely

guarded category of 'special needs.' "[5] Id., 84 see also *Indianapolis* v. *Edmond,* 531 U.S. 32, 42–43, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) ("severe and intractable nature of the drug problem" did not justify establishment of vehicle checkpoints when purpose was general crime control). Thus, the court in *Ferguson* recognized that the special needs balancing test is not applicable in cases where the search is undertaken for general law enforcement purposes. See *Ferguson* v. *Charleston,* supra, 532 U.S. 74 n.7 (recognizing that balancing test should be applied only in exceptional cases where special needs make obtaining warrant impracticable).

---

[5] The court also concluded that "[w]hile state hospital employees, like other citizens, may have a duty to provide the police with evidence of criminal conduct that they inadvertently acquire in the course of routine treatment, when they undertake *to obtain such evidence from their patients for the specific purpose of incriminating those patients,* they have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require." (Emphasis in original.) *Ferguson* v. *Charleston,* supra, 532 U.S. 84-85. I assume that a hospital does not "inadvertently acquire" evidence of cocaine use when it deliberately administers a test for such use, and, accordingly, I interpret this statement to mean that, if the hospital intends, either under a specific policy or in performance of its perceived civic duty, to inform the police if the results of the test are positive, it must obtain the prior consent of the patient. See *Vernonia School District 47J* v. *Acton,* supra, 515 U.S. 650–51, 664–65 (warrantless drug testing of athletes by school officials is reasonable under fourth amendment when test results are used only for school purposes and are not provided to law enforcement officials); *National Treasury Employees Union* v. *Von Raab,* supra, 489 U.S. 666 (warrantless drug testing of customs agents by customs agency is reasonable under fourth amendment when testing program is used for internal purposes and is not designed to serve ordinary needs of law enforcement). Furthermore, I interpret the court's statement that a patient has a reasonable privacy expectation that the results of diagnostic tests will not be disclosed to nonmedical personnel without the patient's consent; *Ferguson* v. *Charleston,* supra, 84-85; to mean that, under the fourth amendment, the police are not authorized to go on fishing expeditions into patients' records, even though, when a state hospital does "inadvertently acquire" evidence of a crime, e.g., evidence of child abuse acquired during treatment of a child's injuries or evidence of drug abuse acquired while treating a patient for an apparent drug overdose, it must preserve medical records pertaining to the crime and may have a duty to disclose that information to the police.

The majority concludes that, under *Whalen*, because a large number of government officials may look at the defendant's pharmacy records, he has no privacy interest in those records vis-a-vis the government and, therefore, a government official's motive for looking at the records is irrelevant for purposes of determining whether a search has taken place. I simply do not see how that conclusion can be reconciled with the special needs cases. In *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 621 n.5, the court explicitly stated that it was leaving to another day "the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the [Federal Railroad Administration's] program." In *Vernonia School District 47J* v. *Acton*, supra, 515 U.S. 658 n.2, the court emphasized that the search under review in that case was reasonable because it was "undertaken for prophylactic and distinctly *non*punitive purposes . . . ." (Citations omitted; emphasis in original.) In *National Treasury Employees Union* v. *Von Raab*, supra, 489 U.S. 666, the drug test results were scrutinized by government officials with criminal law enforcement authority and the court found it constitutionally significant that the drug test results "may not be used in a criminal prosecution of the employee without the employee's consent." Finally, in *Ferguson* v. *Charleston*, supra, 532 U.S. 82-84 the court held that a government program the primary purpose of which was to generate evidence for law enforcement purposes was unconstitutional even when the ultimate purpose of the program was to improve public health.

In my view these cases clearly indicate that the government cannot collect for an administrative purpose sensitive personal information in which an individual would otherwise have a reasonable expectation of pri-

vacy and then, claiming that the expectation of privacy has been vitiated because the information has been collected, use the information in a criminal investigation. I do not believe that if the government policies under review in *Skinner* and *Vernonia School District 47J* had provided that the drug test results routinely would be provided to the police, or if the drug testing program in *National Treasury Employees Union* had provided that the customs service could use the test results for general criminal law enforcement purposes without the consent of the employee, those policies would have been found to be constitutional. Nor do I believe that even if the primary purpose of the government program under review in *Ferguson* had been to identify babies needing special medical attention at birth, but the program had provided that the test results routinely would be provided to the police, such a policy would have been found to be constitutional. I cannot perceive any reason that the government's practice of obtaining such information for a criminal law enforcement purpose in the absence of specific regulatory authority should be treated any differently. Accordingly, I do not believe that such a practice is constitutional. In concluding in this case that it is,[6] the majority essentially has adopted the reasoning of the dissenting opinions in *Ferguson* v. *Charleston,* supra, 532 U.S. 100 (Scalia, J., dissenting) (arguing that existence of criminal law enforcement purpose cannot invalidate otherwise lawful search); and *Indianapolis* v. *Edmond,* supra, 531 U.S. 52 (Rehnquist, C. J., dissenting) (arguing

---

[6] I recognize that the majority concludes that the searches are specifically authorized by § 21a-265 and focuses its analysis on whether that statute is constitutional. As I have already indicated, I disagree with that analysis. Because the majority believes, however, that the defendant forfeited any expectation of privacy in his pharmacy records vis-a-vis the government when it disclosed the information to the pharmacy, it presumably would conclude that the search of the defendant's records was constitutional even in the absence of § 21a-265.

that subjective intent of person performing search is irrelevant and that "[i]t is the objective effect of the State's actions on the privacy of the individual that animates the Fourth Amendment").

I recognize that the special needs cases, unlike this case, involve intrusions into a person's body or home. In my view, however, that distinction is not significant. As recognized by the United States Supreme Court in *Katz* v. *United States*, supra, 389 U.S. 353, "the Fourth Amendment protects people—and not simply 'areas' . . . ." Id. (rejecting view that fourth amendment applies only to intrusion into given enclosure and seizure of tangible items and concluding that it applies to words spoken in public telephone booth). Furthermore, I do not see why the government should be able to do in two or three or four steps what it cannot do in one. If the government cannot collect private materials or information without obtaining a warrant if it intends to use the information for a criminal law enforcement purpose, it cannot compel private entities to collect such information and then obtain it from the private entities and use it for such a purpose.

In short, I believe that an individual's fourth amendment interest in being free from governmental surveillance and intrusion for criminal law enforcement purposes is, as recognized by the court in *Whalen* v. *Roe*, supra, 429 U.S. 599 n.24, distinct from and, in cases where the government has compelled the disclosure for a legitimate regulatory purpose, broader than the fourteenth amendment privacy interest in being free from the disclosure of sensitive personal information. See also *Katz* v. *United States*, supra, 389 U.S. 350 ("[the Fourth] Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all"). This is especially so in cases, like this one, where the records are not required to be kept in

a format that reveals information about specific individuals and, consequently, where there has not necessarily been any prior invasion of an individual's fourteenth amendment privacy interest.[7] Although the government has a legitimate interest in regulating the distribution of Schedule II drugs by pharmacies and physicians that justifies the regulatory inspection scheme, that interest does not require that the government have access to records designed to reveal information about individual consumers, and it would not be undermined by requiring probable cause and a warrant before criminal law enforcement officials are allowed to search such records. Accordingly, I would conclude that the fourth amendment requires probable cause and a search warrant to search an individual's pharmacy records.

Finally, I note that, under the majority's decision in this case, individuals will have even less protection from egregious government conduct than the pervasively regulated pharmacies. The state can now conduct a flagrantly illegal inspection of pharmacy records and use

---

[7] In particular, I note the intangible and divisible nature of the information contained in prescriptions and the nature of the information storage systems used by the pharmacies. The use of an automated data processing system for the storage and retrieval of prescription information allows the pharmacy to produce the information in a variety of formats, not all of which are required by statute, not all of which are calculated to facilitate enforcement of the regulatory scheme, and not all of which reveal information about particular consumers. For example, the state has pointed to nothing in the governing statutes or regulations that specifically requires the pharmacy to maintain patient profiles, and it has not articulated any regulatory reason for Brown to have obtained the profiles in this case. Rather, it would appear that these profiles are maintained for the convenience of the patient and his physician. Furthermore, I note that an individual's potential privacy interest is implicated only if the information is disclosed in a format that reveals information about him personally, not, for example, when it appears anonymously in a record indicating how much of a particular controlled substance a pharmacy distributed in a particular month. I cannot conclude that, by assuming the risk that his prescription information would be used to further the regulatory scheme, the defendant assumed the risk that the government would inspect his patient profiles without a warrant.

any materials seized in a criminal prosecution of an individual, even though it could not use the information in proceedings against the pharmacy, because the conduct simply will not constitute a search as to the individual. This point was made very clearly in *United States* v. *Payner*, 447 U.S. 727, 100 S. Ct. 2439, 65 L. Ed. 2d 468 (1980). In that case, the government engaged in egregious conduct that the United States Supreme Court characterized as "unconstitutional and possibly criminal," in order to obtain evidence against the defendant. Id., 733. Nevertheless, the court held that, because evidence had been in possession of a third party, the defendant had no expectation of privacy in the materials seized and he had no protectible fourth amendment interest. Id., 731–32. Therefore, the court held that the exclusionary rule did not apply. Id., 734. In my view, the special needs cases clearly indicate that this principle does not apply when the government has compelled the disclosure of the object of the search in the first instance.

I would conclude that the defendant's pharmacy records were properly suppressed as having been obtained in the course of a warrantless search unsupported by any recognized exception to the warrant requirement. Accordingly, I dissent.